[Crim. No. 13858. In Bank. Jan. 23, 1970.]

In re RALPH MARTINEZ on Habeas Corpus.

642

**COUNSEL**

Ralph Martinez, in pro. per., and Marsha B. Shanle, under appointment by the Supreme Court, for Petitioner.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, and David Cunningham, Deputy Attorney General, for Respondent.

## Opinion

**TOBRINER, J.**—Ralph Martinez, currently incarcerated in Folsom State Prison, petitions for a writ of habeas corpus, seeking release on the grounds that the Adult Authority revoked his parole without adequate cause. Petitioner alleges that the authority's determination to terminate his parole status was based primarily on (1) evidence obtained through an unconstitutional search and seizure and (2) a confession obtained in violation of *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], and petitioner contends that such matters should not properly be considered by the Adult Authority. We conclude that in view of the uniquely critical responsibilities inherent in the administration of the parole system, the authority could properly consider all the evidence before it.

Initially we review the facts of the case. On May 12, 1955, petitioner was convicted of violation of section 11500 of the Health and Safety Code (sale of narcotics other than marijuana), sentenced and committed to the state prison. After serving over seven years of his sentence, petitioner was released on parole on June 12, 1962. Then in February 1963 he was arrested and charged with possession of heroin; in October 1963 he was found guilty of the charges and sentenced to state prison.

Following the conviction in October 1963, petitioner's parole was cancelled on November 15, 1963, and formally revoked on February 13, 1964. The revocation was ostensibly based on three grounds: (1) the October 1963 conviction; (2) driving a motor vehicle without the knowledge or consent of his parole agent or the Division of Parole, and (3) using alcoholic beverages to excess.

The following year, on March 11, 1965, the Court of Appeal, Second District, reversed petitioner's 1963 conviction, concluding that evidence introduced at trial was obtained pursuant to an unconstitutional search[1] and that statements used against petitioner were obtained in violation of the dictates of *People* v. *Dorado, supra,* 62 Cal.2d 338 (*People* v. *Martinez* (1965) 232 Cal.App.2d 796 [43 Cal.Rptr. 197]). On July 13, 1965, the charges on which petitioner had been convicted in 1963 were dismissed. Petitioner remained in prison, however, because his parole on his 1955 conviction had been revoked.

When petitioner's application for parole next came before the Adult

---

[1]The Court of Appeal found that police officers, after arresting defendant in a car outside his home, had conducted a full search of his home without a search warrant. It concluded on the authority of *People* v. *Cruz* (1964) 61 Cal.2d 861 [40 Cal.Rptr. 841, 395 P.2d 889], that the search was not incident to an arrest and thus that the fruits of the search should be suppressed. (*People* v. *Martinez* (1965) 232 Cal.App. 2d 796, 799-800 [43 Cal.Rptr. 197].)

Authority in October 1965, the reversal of petitioner's 1963 conviction was brought to the authority's attention. The authority nonetheless decided not to restore petitioner to his parole status. The comments recorded on the authority's official evaluation sheet disclose the panel's reasoning: "panel notes that although 1963 charges dismissed on legal technicality of illegal search—case was not dismissed because of lack of involvement—also noted that inmate initially admitted to the charges—and [did] not prosecute appeal for some two years—continuance of incarceration based on parole behavior and not on 1963 commitment."

The circumstances of the present case are comparable to those addressed by this court in *In re Brown* (1967) 67 Cal.2d 339 [62 Cal.Rptr. 6, 431 P.2d 630]. There, as here, the Adult Authority revoked the defendant's parole on several grounds, a criminal conviction constituting the primary, most serious ground. In *Brown*, as in the instant case, the conviction was later overturned on appeal; in *Brown*, reversal rested solely on the introduction at trial of a confession obtained in violation of *Dorado*. Under those circumstances we held that the invalid conviction, relied on by the Adult Authority, could not properly constitute a basis for "cause" to revoke the defendant's parole, and we remanded the case to the authority so that they could decide whether to retain the revocation on the basis of the lesser parole violation with which the parolee had been charged. In addition, we indicated that the reversal of the conviction would not preclude further inquiry by the Adult Authority into the subject matter of the crime in question, to determine if the defendant "had engaged in conduct that constitutes cause for parole revocation." (67 Cal.2d at p. 342.)[2]

Although the February 1964 parole revocation order in the instant case is identical to the one before the court in *Brown* in that it grounds revocation primarily on a conviction which has subsequently been found invalid, we agree with the People's contention that the proceedings in the Adult Authority after the appellate reversal of the defendant's 1963 conviction must properly be viewed as "further inquiry" into the subject matter of the conviction as approved in *Brown* and thus must be considered by this court. In its subsequent proceeding the authority sustained "continuance of incarceration based on parole behavior and not on 1963 commitment." ▮ Upon a complete reading of the authority's records we believe that, although the authority predicated its decision on "parole behavior" rather than on the conviction, the authority considered the illegally obtained

---

[2]In our original opinion in *Brown* we included a sentence which read: "The Authority should not, however, use defendant's confession for any purpose foreclosed to the courts." (67 Cal.2d 339, 341.) The opinion was later modified to omit this sentence (67 Cal.2d 339, 342) when it was recognized that the issue with which the sentence dealt was not properly before the court and had not been fully argued.

évidence that resulted in the reversal of the conviction; the People concede that this is true.[3] In this case we thus face two of the questions left open by our decision in *Brown:* May the Adult Authority, in exercising its broad authority over the parole system and parolees, properly consider evidence which has been obtained by government officials (1) as a result of an unconstitutional search and seizure and (2) through a confession obtained through interrogation when a defendant has not been adequately apprised of his constitutional rights?

We are required to face these issues directly in this case, only because we find, from the facts as related in the prior judicial decision (*People* v. *Martinez, supra,* 232 Cal.App.2d 796, 797-799), that the police authorities, in obtaining the extrinsic evidence and statements from defendant, did indeed violate the defendant-parolee's Fourth and Fifth Amendment constitutional rights.[4] ▪ Although past cases have sometimes declared that a parolee is in "constructive custody" or "without liberty," "[f]ictions of 'custody' and the like . . . cannot change the reality of a parolee's conditional freedom and cannot affect the constitutional protections surrounding his interest in that conditional freedom." (*Rose* v. *Haskins* (6th Cir. 1968) 388 F.2d 91, 98, fn. 2 (Celebrezze, J., dissenting).) In the instant case regular police officers undertook the search pursuant to their general law enforcement duties; the officers, at the time of the search, did not even know of defendant's parole status. ▪ The investigation involved suspected criminal activity, not parole violations. Under these circumstances the officers cannot undertake a search without probable cause and then later seek to justify their actions by relying on the defendant's parole status, a status of which they were unaware at the time of their search. (*People* v. *Gallegos* (1964) 62 Cal.2d 176, 178 [41 Cal.Rptr. 590,

---

[3]When the Adult Authority acts to suspend or to revoke a parolee's parole status, it must issue a formal order designating the grounds for revocation. (Pen. Code, § 3063.) The authority apparently does not normally prepare such an order, designating the grounds for its decision, when it denies a parolee's initial request for release on parole. An order incorporating the grounds for the authority's decision should be prepared, however, whenever, as in the instant case, the authority reconsiders a previous parole revocation after one of its initial grounds for revocation is invalidated. This formal order is necessary to facilitate judicial review of the authority's subsequent determination on the issue of revocation.

Although the authority did not prepare a formal, written statement in the instant case, and the precise nature of the "parole conduct" referred to in the informal record of the authority's 1965 hearing is not clear, the state has conceded that the authority relied at least in part on acts of the defendant evidenced by the illegally obtained matter. We proceed to analyze the authority's determination on the basis of the state's concession.

[4]The Court of Appeal's opinion does not mention defendant's parole status. From its discussion of the facts, however, it made clear that the officers were not aware of defendant's status, but were merely performing their normal investigatory activities. The People do not suggest otherwise.

397 P.2d 174]; *People* v. *Gastelum* (1965) 237 Cal.App.2d 205, 207 [46 Cal.Rptr. 743]; *People* v. *Hernandez* (1964) 229 Cal.App.2d 143, 147, fn. 2 [40 Cal.Rptr. 100]; cf. *People* v. *Rosales* (1968) 68 Cal.2d 299 [66 Cal. Rptr. 1, 437 P.2d 489] (parolee entitled to protection of Penal Code section 844).)[5]

Since we do not adjudicate a search of a parolee initiated by a parole agent in connection with duties of parole administration, we need not decide under what circumstances, if any, such a search may be "reasonable" within the meaning of the Fourth Amendment even without a full showing of probable cause.[6] The Court of Appeal, in the previous criminal action, correctly determined that evidence obtained pursuant to this search could not be admitted at the defendant's criminal trial.

In addition, the defendant's parole status, of course, did not permit the police to interrogate the defendant in connection with the suspected criminal activity without first apprising him of his constitutional rights. The strictures of *Dorado* apply whenever the police initiate custodial interrogation in connection with their investigation of a new criminal matter; indeed, in *Dorado* itself, the defendant was an incarcerated prisoner, who had allegedly committed a crime within the prison and who was interrogated by prison officials. (62 Cal.2d at pp. 342-344.) ■ The Fifth Amendment rights of parolees equally demand these protections. (See *In re Brown, supra,* 67 Cal.2d 339, 340; *People* v. *Gastelum, supra,* 237 Cal.App.2d 205, 209.)

---

[5]*People* v. *Goss* (1961) 193 Cal.App.2d 720, 724-725 [14 Cal.Rptr. 569], is disapproved insofar as dictum therein implies that a parolee is without any constitutional protection against unreasonable searches and seizures. (See *Brown* v. *Kearney* (5th Cir. 1966) 355 F.2d 199, 200.)

[6]Searches by parole officers pursuant to their duties, just as other administrative searches (see *Camara* v. *Municipal Court* (1967) 387 U.S. 523 [18 L.Ed.2d 930, 87 S.Ct. 1727]) are subject to the broad reasonableness requirement of the Fourth Amendment. (See, e.g., *People* v. *Langella* (1963) 41 Misc.2d 65 [244 N.Y.S.2d 802, 805]; *Martin* v. *United States* (4th Cir. 1950) 183 F.2d 436, 439, cert. den. 340 U.S. 904 [95 L.Ed. 654, 71 S.Ct. 280]; cf. *Terry* v. *Ohio* (1968) 392 U.S. 1, 16-20 [20 L.Ed.2d 889, 902-905, 88 S.Ct. 1868].) The conditional nature of a parolee's freedom may result in some diminution of his reasonable expectation of privacy and thus may render some intrusions by parole officers "reasonable" even when the information relied on by the parole officers does not reach the traditional level of "probable cause." A diminution of Fourth Amendment protection, however, can be justified only to the extent actually necessitated by the legitimate demands of the operation of the parole process (see *United States* v. *Lewis* (S.D.N.Y. 1967) 274 F.Supp. 184, 190; cf. *Camara* v. *Municipal Court, supra,* 387 U.S. 523, 534-539 [18 L.Ed.2d 930, 938-941, 87 S.Ct. 1727]; Note, *Parole Status and the Privilege Concept,* 1969 Duke L.J. 139, 145 fn. 19.) When a police officer is not aware that a suspect is on parole, or is not investigating a parole violation, an intrusion into the parolee's privacy cannot be properly justified by the needs of the parole system. (See also *United States* v. *Hallman* (3d Cir. 1966) 365 F.2d 289 (parole officer was acting merely as "agent, tool or device" of arresting police officers and thus his search of parolee without probable cause was illegal).)

Thus the statements elicited from defendant Martinez in the instant case were obtained in violation of his constitutional rights and were properly determined to be inadmissible at his criminal trial.

We therefore must now turn to the difficult problems presented by the Adult Authority's consideration of this evidence. In resolving these questions we look initially to the test articulated by our court in *People* v. *Moore* (1968) 69 Cal.2d 674 [72 Cal.Rptr. 800, 446 P.2d 800]; there we examined the applicability of the Fourth Amendment exclusionary rule to a civil narcotics commitment proceeding. We declared in *Moore:* "Whether any particular rule of criminal procedure should be applied in a narcotic addict commitment proceeding depends upon consideration of the relationship of the policy underlying the rule to the proceeding. (Cf. *In re Gault,* 387 U.S. 1, 13-14 [18 L.Ed.2d 527, 538, 87 S.Ct. 1428].)" (69 Cal.2d at pp. 681-682.) In determining the applicability of the Fourth Amendment and the *Dorado-Miranda* exclusionary rules to Adult Authority proceedings we examine both the policies underlying the rules *and* the purposes and nature of the proceeding.

1. *One purpose of both the Fourth Amendment exclusionary rule and the Dorado-Miranda exclusionary rule is the deterrence of illegal governmental conduct.*

As we recognized in *Moore,* "[t]he basic purpose of the [Fourth Amendment] exclusionary rule is to deter unconstitutional methods of law enforcement. (*Elkins* v. *United States,* 364 U.S. 206, 217 [4 L.Ed.2d 1669, 1677, 80 S.Ct. 1437]; *Mapp.* v. *Ohio* [1961] *supra,* 367 U.S. 643, 656 [6 L.Ed.2d 1081, 1090, 81 S.Ct. 1684]; *People* v. *Parham,* 60 Cal.2d 378, 385 [33 Cal.Rptr. 497, 384 P.2d 1001]; *People* v. *Cahan, supra,* 44 Cal.2d 434, 445 et seq. [282 P.2d 905, 50 A.L.R.2d 513].)" (69 Cal.2d at p. 682.) The rule attempts "to compel respect for the constitutional guarantee [to be free from unreasonable search and seizure] in the only effectively available way—by removing the incentive to disregard it." (*Elkins* v. *United States* (1960) 364 U.S. 206, 217 [4 L.Ed.2d 1669, 1677, 80 S.Ct. 1437, 1453].) "By denying any profit from the unconstitutional methods of law enforcement, it is to be anticipated that law enforcement officials will have no incentive to engage in such methods." (*People* v. *Moore, supra,* 69 Cal.2d 674, 682.)

The decision of this court in *Dorado,* and subsequently the decision of the United States Supreme Court in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], requiring the exclusion of confessions elicited through custodial interrogation when the defendant was not adequately apprised of his constitutional rights, rested,

in part, on a similar need to deter improper law enforcement activity. As the extensive discussion of the coercive police interrogation procedures in *Miranda* indicates (384 U.S. at pp. 445-458 [16 L.Ed.2d at pp. 707-714]), the warnings were believed constitutionally required to insure that government officials would not exceed constitutional bounds in eliciting confessions from suspects. ■ The remedy of excluding all confessions obtained without such warnings contemplated a dual purpose: (1) to prevent the introduction of a confession that may not have been truly the product of a free will and (2) to deter the police from engaging in "third degree" practices, activities "at odds with one of our Nation's most cherished principles —that the individual may not be compelled to incriminate himself." (384 U.S. at pp. 457-458 [16 L.Ed.2d at pp. 713-714].)

As we stated explicitly in *In re Lopez* (1965) 62 Cal.2d 368, 372-373 [42 Cal.Rptr. 188, 398 P.2d 380], the companion case of *Dorado:* "[W]e believe that the United States Supreme Court in *Escobedo* sought primarily to prevent police tactics which, in the past, have spawned involuntary confessions. . . . [T]he rule contemplated the prospective prevention of coercive practices—not the extirpation of such practices committed in the past." (See also *Johnson* v. *New Jersey* (1966) 384 U.S. 719 [16 L.Ed.2d 882, 86 S.Ct. 1772].)

2. *The critical responsibilities of the administration of the parole system require that the Adult Authority generally be permitted to consider all relevant evidence.*

■ Although we recognize that theoretically the exclusion of the products of illegal searches and interrogations from Adult Authority proceedings would supplement the deterrent force of the criminal trial exclusionary rules, we must also consider the unique nature and responsibilities of the Adult Authority and the extremely high costs which the expanded application of the exclusionary rule would entail in this context. Our desire to preserve legalistic symmetry cannot obscure the necessity of examining the practical merits of the underlying competing societal interests actually at stake. We must be ever-cautious of becoming "so overly concerned with 'the internal perfecting of [the law's] own categories' as to forget the goals of the [judicial] enterprise." (See Cox, *Chief Justice Earl Warren* (1969) 83 Harv.L.Rev. 1, 2.)

We believe, at this time, that the incremental deterrent effect that will realistically be achieved by shielding the Adult Authority from illegally procured evidence is slight; the bungling police officer is not likely to be halted by the thought that his unlawful conduct will prevent the termination

of parole because the authority cannot consider the evidence that he unlawfully procures. When, as in the instant case, the police are not even aware that a suspect is a parolee, the supplemental deterrent factor is, of course, completely absent.

On the other hand, the social consequences of imposing the exclusionary rule upon the authority can be disastrous. Conceivably, if the improperly obtained evidence were the sole basis for parole revocation, the authority might find itself unable to act in the case of the paroled murderer whom the police improperly discovered had cached a minor armory for future use or the paroled narcotics peddler who had collected a quantity of heroin for future sale. Although we recognize, of course, that such evidence would not be admissible in a court of law, we believe that an agency whose delicate duty is to decide when a convicted offender can be safely allowed to return to and remain in society is in a different posture than the court which decides his original guilt. To blind the authority to relevant facts in this special context is to incur a risk of danger to the public which, at least as of this date, outweighs the competing considerations of a problematical gain in deterrence. We thus conclude that at this time the general Fourth Amendment and *Dorado* exclusionary rules are not applicable to Adult Authority proceedings.

 In holding that the Adult Authority could properly consider the illegally obtained evidence in this case, we specifically note that we are not faced with a situation in which it has been alleged that the circumstances surrounding the interrogation are of a nature to render the confession "involuntary" or "coerced" (see, e.g., *Brooks* v. *Florida* (1967) 389 U.S. 413, 414-415 [19 L.Ed.2d 643, 645-646, 88 S.Ct. 541]; *Beecher* v. *Alabama* (1967) 389 U.S. 35, 36-38 [19 L.Ed.2d 35, 37-38, 88 S.Ct. 189]; *Sims* v. *Georgia* (1967) 389 U.S. 404, 406-407 [19 L.Ed.2d 634, 636-637, 88 S.Ct. 523])[7] or that the police conduct in effectuating the search was so egregious as to offend "the 'traditions and [collective] conscience of our people.'" (*Griswold* v. *Connecticut* (1965) 381 U.S. 479, 493 [14 L.Ed.2d 510, 520, 85 S.Ct. 1678] (Goldberg, J., concurring) (quoting *Snyder* v. *Massachusetts* (1934) 291 U.S. 97, 105 [78 L.Ed. 674, 677, 54 S.Ct. 330, 90 A.L.R. 575]) or to "shock the conscience." (See *Rochin* v. *California* (1952) 342 U.S. 165, 172-174 [96 L.Ed. 183,

---

[7]In *Johnson* v. *New Jersey, supra,* 384 U.S. 719, the United States Supreme Court drew this identical distinction between "involuntary" confessions and confessions inadmissible under the prophylactic rules of *Escobedo* and *Miranda* in concluding that *Escobedo* and *Miranda* were to be applied prospectively, while the rules concerning "involuntary" confessions had full retroactive effect. (384 U.S. at pp. 729-732 [16 L.Ed.2d at pp. 889-891].) (See also *People* v. *Varnum* (1967) 66 Cal.2d 808, 812-813 [59 Cal.Rptr. 108, 427 P.2d 772].)

190-191, 72 S.Ct. 205, 25 A.L.R.2d 1396].)[8] If we were presented with an instance in which the Adult Authority considered evidence obtained under those circumstances we might well conclude that the constitutional demands of due process could not countenance *any* governmental use of such evidence, even by the Adult Authority.

In declining to apply the exclusionary rules to Adult Authority proceedings, we do not, of course, intimate that these exclusionary rules are not applicable to other administrative proceedings. (See *Knoll Associates, Inc.* v. *Federal Trade Com.* (7th Cir. 1968) 397 F.2d 530, 533-534 (Fourth Amendment exclusionary rule applied to Fed. Trade Com. hearing); *Leogrande* v. *State Liquor Authority* (1966) 25 App.Div.2d 225 [268 N.Y.S.2d 433], revd. on other grounds (1967) 19 N.Y.2d 418, [280 N.Y.S.2d 381, 227 N.E.2d 302] (Breitel, J.) (Fourth Amendment exclusionary rule applied to liquor license revocation proceeding); cf. *In re Marsh* (1968) 40 Ill.2d 53 [237 N.E.2d 529, 531] (Fourth Amendment exclusionary rule applied to juvenile proceedings).)[9] In other circumstances, the consequences of excluding some relevant information may not be as dire as they are in the Adult Authority context, and thus our evaluation of the appropriateness of applying the exclusionary rule may well be altered.

We thus conclude that in the instant case the Adult Authority could properly consider all the evidence before it and its decision to reaffirm

---

[8]Compare *Rochin* v. *California, supra,* 342 U.S. 165 (use of evidence obtained through "stomach pumping" violates due process) with *Aguilar* v. *Texas* (1964) 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509] (use of evidence obtained through search pursuant to invalid warrant violates Fourth Amendment). In *Schmerber* v. *California* (1966) 384 U.S. 757 [16 L.Ed.2d 908, 86 S.Ct. 1826], after concluding that a requirement that a defendant submit to a blood test performed by a physician in a hospital environment according to accepted medical practices was permissible, the court went on to point out that "[w]e are thus not presented with the serious questions which would arise if a search involving the use of a medical technique, even of the most rudimentary sort, were made by other than medical personnel or in other than a medical environment—for example, if it were administered by police in the privacy of the stationhouse. *To tolerate searches under these conditions might be to invite an unjustified element of personal risk of infection and pain.*" (Italics added.)

[9]We must note that in reaching our decision we do not rely on the fact that strict rules of evidence may not be applicable because of the informal, administrative nature of the Adult Authority proceedings. (Cf. *Robinson* v. *Cox* (1966) 77 N.M. 55 [419 P.2d 253, 256].) The purposes of the constitutional exclusionary rules are entirely unrelated to the ends served by normal rules of evidence, and the mere fact that rules of evidence are relaxed will generally have no bearing on the applicability of the constitutional exclusionary rules.

the revocation of petitioner's parole, after the reversal of his 1963 conviction, may stand.

The writ is denied.

Traynor, C. J., McComb, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

**PETERS, J.**—I dissent.

The majority hold that evidence concededly obtained in violation of the constitutinoal protection to which a parolee continues to be entitled may properly be considered by the Adult Authority "in exercising its broad authority over the parole system and parolees, . . ." In reaching their conclusion, the majority purport to apply the following test: "In determining the applicability of the Fourth Amendment and the *Dorado-Miranda* exclusionary rules to Adult Authority proceedings we examine both the policies underlying the rules *and* the purposes and nature of the proceeding."

Although I agree with the basic test set out by the majority, I am of the opinion that the majority have reached an incorrect result by failing to examine adequately the opposing interests involved. In the first place, they assert without any analysis their belief that the incremental deterrence of police misconduct to be reaped from an application of the exclusionary rule to Adult Authority proceedings would be "slight." Second, they fail even to mention a second purpose served by the exclusionary rule—to uphold the integrity of our system of government. On the other hand, in discussing the "social consequences" of applying the exclusionary rule to Adult Authority proceedings, the majority mention no "consequences" that are unique to such proceedings and that distinguish them from court proceedings; instead, they merely state their belief that the authority is "in a different posture" than the courts.

Contrary to the majority, I believe that to hold unconstitutionally obtained evidence admissible in Adult Authority proceedings will furnish an incentive to government officials to violate the Fourth, Fifth, and Fourteenth Amendments, especially when the subject of their investigation is a parolee.

As this court stated in *People* v. *Moore,* 69 Cal.2d 674, 682 [72 Cal. Rptr. 800, 446 P.2d 800], "[t]he basic purpose of the exclusionary rule it to deter unconstitutional methods of law enforcement. [Citations.] The exclusionary rule is not a penalty but is derived from the principle that the state must not profit from its own wrong. [Citation.] By denying *any* profit from the unconstitutional methods of law enforcement, it is to be

anticipated that law enforcement officials will have *no* incentive to engage in such methods." (Italics added.)

Conversely, once law enforcement officials are permitted to profit in any conceivable way as a direct result of unconstitutional methods of law enforcement it is to be anticipated that they will have an incentive to engage in such methods in the hope of uncovering some evidence from which they may profit. The officials ordinarily suffer no penalty for their unlawful conduct. (See, e.g., *Mapp* v. *Ohio* (1961) 367 U.S. 643, 670 [6 L.Ed.2d 1081, 1098, 81 S.Ct. 1684] (Douglas, J., concurring).) Faced with a situation where there might be something to gain, even where the possibility of gain is remote, and where they cannot secure evidence by legal means, the danger of the officials engaging in unconstitutional methods of law enforcement is acute. (Cf. *People* v. *Cahan,* 44 Cal.2d 434, 449 [282 P.2d 905, 50 A.L.R.2d 513].)

Because the laudable purpose of the exclusionary rule—to deter unconstitutional methods of law enforcement—can only be served by denying the government *any* and *all* profit from such methods, any exception to the rule eliminates the deterrent effect of the rule and encourages law enforcement officials to engage in the unlawful conduct. When those officials have nothing to lose and something to gain by such conduct, the deterrent effect of the rule is largely if not entirely destroyed. Under today's majority decision, a law enforcement official is encouraged to engage in unconstitutional law enforcement methods in the hope that the evidence thereby secured may be profitably used should it subsequently appear that the victim of such conduct was a parolee.

Not only does the majority opinion jeopardize the constitutional rights of citizenry in general, it completely emasculates those limited constitutional rights to which it concedes parolees are entitled. Investigations of parole violations and new criminal offenses are very often cooperative efforts; police and parole officers frequently work together to reimprison the parolee suspected of criminal activity. When the cost of prosecution in terms of time and money is considered too high, and when the parolee still has a considerable time to serve on his original sentence, the People will often forego a new criminal trial and instead will look to the parole revocation to serve the ends of a new conviction.[1]

---

[1]The California Adult Authority's Statement of Policy Concerning Cooperation With Law Enforcement Regarding Revocation of Parole for New Offenses Without Prosecution (Nov. 1, 1957) declares: "Whenever a parolee comes to the attention of law enforcement for a new offense, the parole agents, under established policy, are instructed to cooperate fully with investigating and prosecuting agencies. . . . [¶] Experience reveals that prosecution usually follows where evidence is sufficient to establish guilt. However, there are a number of exceptions involving cases in which prosecution agencies have indicated that the time, trouble and expense of prosecution

Thus the similarity of the results of conviction and parole revocation and the ongoing participation of general law enforcement officials in parole violation cases support the conclusion that the consequences of potential parole revocation are within the general police officer's train of thought. Unless the exclusionary rule is applied to Adult Authority proceedings, there will be no protection for the Fourth, Fifth, and Fourteenth Amendment rights retained by the parolee. It is anomalous for the majority to recognize the limited constitutional rights of parolees and at the same time to render them meaningless by allowing police to violate them with impunity so as to secure a parolee's parole revocation.

Moreover, the majority state merely that "[o]ne purpose of both the Fourth Amendment exclusionary rule and the *Dorado-Miranda* exclusionary rule is the deterrence of illegal governmental conduct." (Itálics deleted in part.) They fail completely to mention another purpose of the exclusionary rule that also would be served by withdrawing illegally obtained evidence from the proper consideration of the Adult Authority—"the imperative of judicial integrity." (*Elkins* v. *United States* (1960) 364 U.S. 206, 222 [4 L.Ed.2d 1669, 1680, 80 S.Ct. 1437, 1453].) This secondary function of the exclusionary rule draws its strength from the profound philosophical roots that support a government of law. This court has articulated this concern in a variety of ways, declaring that "the state must not profit from its own wrong" (*People* v. *Parham,* 60 Cal.2d 378, 386 [33 Cal.Rptr. 497, 384 P.2d 1001]), and that it is "morally incongruous" for the state to impose punishment when it, itself, has become a law breaker. (*People* v. *Cahan, supra,* 44 Cal.2d 434, 446.) In both *Miranda* v. *Arizona* (1966) 384 U.S. 436, 479-480 [16 L.Ed.2d 694, 726-727, 86 S.Ct. 1602, 10 A.L.R.3d 974], and *Mapp* v. *Ohio, supra,* 367 U.S. 643, 659 [6 L.Ed.2d 1081, 1092, 81 S.Ct. 1684], the United States Supreme Court cited with approval Justice Brandeis' eloquent dissent in *Olmstead* v. *United States* (1928) 277 U.S. 438, 485 [72 L.Ed. 944, 960, 48 S.Ct. 564, 66 A.L.R. 376]: "Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. . . . If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy." (See also, *People* v. *Cahan, supra,* 44 Cal.2d 434, 446.)

Reliance on fruits of illegal government action is as destructive of the appearance of justice and as likely to lead to the miseducation of the

seemed unnecessary since the return to prison under revocation of parole offered adequate protection to society. [¶] In principle, the Adult Authority is in accord with this approach. In the past this procedure has been followed in some areas with such good effect that it seems desirable that this policy be made clear throughout the State so that the program may be adopted and followed to whatever extent local agencies care to employ it."

public in the case of parole revocation as it is in a more formal criminal trial. Indeed, the condonation of government lawlessness is conceivably even less acceptable in parole proceedings than in criminal trials; the rehabilitative foundations of the entire parole system can be completely undermined when a parolee observes his teacher, the government, violate the law with apparent immunity.

On the other hand, the majority fail to mention any "social consequences" of applying the exclusionary rule to Adult Authority proceedings that are not equally a result of applying the rule to court proceedings. In either case, the result will sometimes be that the government will be unable to act against criminals—even dangerous criminals. This would be true in Adult Authority proceedings when the illegally obtained evidence is the sole basis for parole revocation just as it is now true in court proceedings when the illegally obtained evidence is the sole basis for conviction. The United States Supreme Court and this court were both well aware that the application of the exclusionary rule to court proceedings would sometimes result in the freeing of criminals who would otherwise be incarcerated. (See, e.g., *Mapp* v. *Ohio, supra,* 367 U.S. 643, 659; *Elkins* v. *United States, supra,* 364 U.S. 206, 217-218 [4 L.Ed.2d 1669, 1677-1678, 80 S.Ct. 1437, 1453]; *People* v. *Cahan, supra,* 44 Cal.2d 434, 438-439, 449-450.) As this court stated in *People* v. *Cahan, supra,* 44 Cal.2d 434, 449, "[i]t is contended, however, that the police do not always have a choice of securing evidence by legal means and that in many cases the criminal will escape if illegally obtained evidence cannot be used against him. This contention is not properly directed at the exclusionary rule, but at the constitutional provisions themselves. It was rejected when those provisions were adopted." And certainly police officers who violate the fundamental guarantees in order to obtain parole revocation are no less guilty of violating the basic law of the land than officers who violate those guarantees for the purpose of the apprehension and conviction of criminal offenders. (Cf. *People* v. *Moore, supra,* 69 Cal.2d 674, 680.)

Recognition of the basic rationales underlying the exclusionary rule has led many courts to hold the rule applicable in noncriminal proceedings. In addition to our decision involving narcotic commitment proceedings in *People* v. *Moore, supra,* 69 Cal.2d 674, the United States Supreme Court has held the rule applicable in civil forfeiture proceedings, proceedings in which the government is one of the adversary parties. (*One 1958 Plymouth Sedan* v. *Pennsylvania* (1965) 380 U.S. 693 [14 L.Ed.2d 170, 85 S.Ct. 1246]; see *People* v. *One 1960 Cadillac Coupe,* 62 Cal.2d 92, 96-97 [41 Cal.Rptr. 290, 396 P.2d 706]; cf. *Hinchcliffe* v. *Clarke* (N.D. Ohio 1963) 230 F.Supp. 91, 100-102 (rule applied in civil tax assessment proceeding); *United States* v. *Blank* (N.D. Ohio 1966) 261 F.Supp. 180,

182-184 (same); *In re Marsh* (1968) 40 Ill.2d 53, 55 [237 N.E.2d 529, 531] (rule applied in juvenile proceedings).)

Although the Supreme Court has not yet addressed the question of the rule's application to administrative proceedings, the genre encompassing Adult Authority interviews, several courts, state and federal, have recently concluded that the purposes of the rule dictate that it be given effect in such proceedings. *(Knoll Associates, Inc. v. Federal Trade Com.* (7th Cir. 1968) 397 F.2d 530, 533-534 (F.T.C. proceeding); *Leogrande v. State Liquor Authority* (1966) 25 App.Div.2d 225 [268 N.Y.S.2d 433], reversed on other grounds (1967) 19 N.Y.2d 418 [280 N.Y.S.2d 381, 227 N.E.2d 302] (Breitel, J.) (liquor license revocation proceeding); *Finn's Liquor Shop, Inc. v. State Liquor Authority* (1968) 31 App.Div.2d 15, 19 [294 N.Y.S.2d 592, 596] (same); *Malik v. New York State Liquor Authority* (1968) 30 App.Div.2d 1040 [294 N.Y.S.2d 948] (same).)

Judge Breitel's reasoning in *Leogrande v. State Liquor Authority, supra,* 25 App.Div.2d 225, 231-232 [268 N.Y.S.2d 433, 440], is germane to the parole revocation context: "All of the reasons in policy which suggest the application of the exclusionary rule to illegal searches and seizures by public officers in criminal proceedings apply equally to administrative proceedings of the present character, namely those involving penalties, forfeitures, or other sanctions for the violation of law or regulation.[2] . . . The exclusionary rule is addressed to the obnoxiousness of illegal conduct by public officials and the visiting by officials of serious official consequences upon the victims of such illegal conduct. . . . *The exclusionary rule rests on a theory of deterrence; that policy would not be served if the illegal official activity could be used, despite unavailability in criminal proceedings, to effect parallel sanctions of forfeiture in an administrative proceeding.*" (Italics added.)

I recognize that many of the constitutional criminal protections available to defendants at trial, or even at noncriminal narcotic commitment proceedings, have in the past been held not constitutionally required in parole revocation proceedings. (See, e.g., *In re McLain,* 55 Cal.2d 78, 85 [9 Cal.Rptr. 824, 357 P.2d 1080] (no constitutional right to notice or hearing); *In re Schoengarth,* 66 Cal.2d 295, 304 [57 Cal.Rptr. 600, 425 P.2d 200] (no constitutional right to appointment of counsel).) The

---

[2]*Leogrande* cannot be distinguished from the instant case on the grounds that there is no forfeiture because the parolee has no right to his parole status. The dissent in *Leogrande* emphasized the "privilege" nature of a liquor license but was unable to persuade the majority that the label of "privilege" had any substantive effect. The trend of the developing case law is to deny any distinction flowing from the "right-privilege" terminology. (See Van Alstyne, *The Demise of the Right-Privilege Distinction in Constitutional Law* (1968) 81 Harv.L.Rev. 1439; Note, *Constitutional Law: Parole Status and the Privilege Concept,* 1969 Duke L.J. 139.)

People maintain that these decisions demonstrate the inapplicability of the exclusionary rule in the instant case. This argument, however, overlooks the distinct rationale of the exclusionary rule. While the right to hearing or the right to counsel are protections aimed at preserving the accuracy and integrity of a given decision-making process, the exclusionary rule's purpose of deterrence is not related to the fairness of the parole revocation proceeding but is concerned with protecting the constitutional rights of all citizens, including the limited rights to which the majority concede parolees are entitled. While a parolee may enjoy no constitutional right to a hearing at parole revocation, he does—as the majority themselves concede (majority opinion, fn. 6)—have a constitutional right to be free of at least certain governmental intrusions into his privacy; in this case it has already been determined that this constitutional right of defendant has been violated. A decision finding the exclusionary rule applicable to Adult Authority proceedings is thus not irreconcilable with our prior case law. As I have pointed out, to hold unconstitutionally obtained evidence admissible in Adult Authority proceedings would furnish an incentive to government officials generally to violate the Fourth, Fifth, and Fourteenth Amendments, especially when the subject of their investigation is a parolee.

In sum, the "social consequences" of applying the exclusionary rule to Adult Authority proceedings are no different from the "social consequences" of applying the exclusionary rule to court proceedings. More important, the result of the majority's holding that the exclusionary rule does not apply to Adult Authority proceedings is that the constitutional rights of the general citizenry will be jeopardized and that a parolee's limited constitutional rights—to which even the majority readily concede he is entitled—will be held only at the whim of the police.

The People maintain that the Adult Authority had before it other evidence, untainted by the illegal police conduct, implicating petitioner in the 1963 criminal activity, and thus that there are grounds to sustain the parole revocation even if the illegally obtained evidence should have been excluded. It is unclear from the meagre Adult Authority records, however, what the authority relied on in finding the petitioner guilty of errant "parole behavior." Given this ambiguity, the proper disposition of the case would be a remand to the authority to consider whether revocation was justifiable absent the illegally obtained evidence.