[Crim. No. 20219. Feb. 22, 1979.]

In re OWEN E., a Person Coming Under the Juvenile Court Law.
OWEN E., Plaintiff and Respondent, v.
PEARL S. WEST, as Director, etc., Defendant and Appellant.

## COUNSEL

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Frederick R. Millar, Jr., Beverly K. Falk and Alexander W. Kirkpatrick, Deputy Attorneys General, for Defendant and Appellant.

Olsen & Sorrentino, Christopher M. Gilman and Gary K. Olsen for Plaintiff and Respondent.

## OPINION

**CLARK, J.**—Director of California Youth Authority (CYA) appeals from juvenile court order vacating order of commitment of Owen E. to CYA custody. Director contends the juvenile court erred in redetermining a ward's rehabilitative needs, CYA having properly determined the ward's application for parole be denied in his best interests. We agree with the director and reverse the order.

Understanding of the posture of the cause before us is essential to our resolution of the issues. Owen was properly committed to a CYA facility in August 1974.[1] For 18 months he participated in an educational program, making normal progress towards rehabilitation. In fall 1976 CYA denied Owen's application for parole because in its view he had not yet accepted responsibility for his actions resulting in his commitment and did not fully appreciate his obligations to society. Shortly thereafter and without pursuing an administrative appeal from the denial, Owen's mother petitioned the juvenile court to vacate the 1974 commitment. (§ 778.)[2] The juvenile court, considering the same matters deemed by

---

[1] In August 1974 Owen, then 17 years of age, intentionally shot and killed his father after an argument at the family home. Owen first denied then several days later admitted the killing. Following hearing and stipulation to the facts he was declared a ward of the juvenile court. (Welf. & Inst. Code, § 602.) He was committed to CYA in March 1975.

Unless otherwise specified, all following statutory references are to sections of the Welfare and Institutions Code.

[2] Section 778 provides: "Any parent or other person having an interest in a child who is a ward or dependent child of the juvenile court or the child himself through a properly appointed guardian may, upon grounds of change of circumstances or new evidence, petition the court in the same action in which the child was found to be a ward or dependent child of the juvenile court for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. The petition . . . shall set forth in concise language any change of circumstance or new evidence which are alleged to require such change or order or termination of jurisdiction.

CYA to necessitate a continuation of Owen's participation in its program, concluded his rehabilitative needs would best be satisfied if he were released from custody. It set aside its original order of commitment and placed Owen on probation in the custody of his mother and ordered continuing therapy in an outpatient program.

This is not a case wherein Owen challenges the propriety of the order finding him a ward of the court or of the order of commitment in the first instance. Nor is any claim made that because of the availability of new facts or information the order of commitment should be reconsidered as having been improvidently made. Nor does Owen seek relief on any ground for which the writ of habeas corpus might lie. He does not complain that the length of his confinement is disproportionate to the gravity of his misconduct or to his rehabilitative needs. He does not complain that conditions of his confinement are so onerous as to deny him any protected right—in fact, both Owen and CYA agree Owen has adapted well to its program.

Owen's sole complaint is simply that CYA has abused its discretion in denying him immediate relief from commitment. He seeks in effect to establish the juvenile court's superior authority to reconsider and overrule a discretionary determination made by CYA pursuant to authority vested in CYA by the Legislature.[3]

FACTUAL BASIS FOR GRANTING PAROLE OR VACATING COMMITMENT

At the juvenile court hearing on the motion to vacate his commitment, Owen claimed CYA could no longer serve his rehabilitative needs.[4] Owen testified he was entered in a college program at a CYA facility and had completed 39 units,[5] but had been denied permission to attend

---

"If it appe:;r's that the best interests of the child may be promoted by the proposed change of ord&; or termination of jurisdiction, the court shall order that a hearing be held and shall giv:: prior notice, or cause prior notice to be given, to such persons and by such means as prescribed by Sections 776 and 779, and, in such instances as the means of giving notice is not prescribed by such sections, then by such means as the court prescribes."

[3]We note that during the pendency of these proceedings the juvenile court order appealed from has been stayed but CYA, in recognition of Owen's continuing progress toward rehabilitation, has released him on parole.

[4]Owen's petition was supported by the testimony of a private psychiatrist, who stated there was only a "remote" likelihood of a repetition of Owen's behavior and that Owen could be reached through therapy as an outpatient for his continuing therapeutic needs. The witness also stated Owen had benefited by his commitment to CYA; however, he gave equivocal testimony concerning Owen's continuing benefit under CYA's program.

[5]Owen had achieved a 3.02 grade point average on a maximum 4.0 scale.

off-grounds college courses. He further testified he wished to pursue a professional baseball career, but baseball (hardball) facilities were not available at the facility.[6]

A psychiatrist, a clinical psychologist intern, a social worker and parole agent, and a program administrator, all CYA staff members who had worked with Owen, testified he had continuing rehabilitative needs best served by the CYA program. They testified to CYA concern for Owen's lack of insight into the criminal nature of his conduct, his failure to acknowledge his role as a wrongdoer, and a tendency to excuse or justify his conduct. In their views Owen's continued confinement to an environment which required him to recognize and conform to standards approved by society would be beneficial to him and would foster further rehabilitation. On the other hand, an early release as on parole would tend to give support to his attitude of having committed an excusable or justifiable act.

There was also testimony that, after the possibility arose Owen would be transferred to another facility when found to have possession of marijuana during the pendency of the instant petition, he stated the school program had been of benefit to him and he wished to remain there.

## Applicable Law

Owen contends the juvenile court is vested with final authority to determine his rehabilitative needs. He asserts the juvenile court's authority to vacate his commitment to CYA derives from section 779.[7] That portion of section 779 limiting the court's authority to "change,

---

[6]It appears that the denial of off-grounds course participation and the unavailability of baseball facilities precipitated application for parole and, upon denial of such application, the filing of the instant petition.

[7]Section 779 provides in pertinent part: "The court committing a ward to the Youth Authority may thereafter change, modify, or set aside the order of commitment. Ten days' notice of the hearing of the application therefor shall be served by United States mail upon the Director of the Youth Authority. In changing, modifying, or setting aside such order of commitment, the court shall give due consideration to the effect thereof upon the discipline and parole system of the Youth Authority or of the correctional school in which the ward may have been placed by the Youth Authority. Except as in this section provided, nothing in this chapter shall be deemed to interfere with the system of parole and discharge now or hereafter established by law, or by rule of the Youth Authority, for the parole and discharge of wards of the juvenile court committed to the Youth Authority, or with the management of any school, institution, or facility under the jurisdiction of the Youth Authority. Except as in this section provided, nothing in this chapter shall be deemed to interfere with the system of transfer between institutions and facilities under the jurisdiction of the Youth Authority."

modify, or set aside" an order of commitment by requiring that it give "due consideration to the effect" of such an order "on the discipline and parole system of the Youth Authority," is critical to our resolutions herein.

Director claims the juvenile court may preempt CYA only when the court can identify a clear abuse of discretion. Owen, on the other hand, maintains the juvenile court judge, before exercising authority conferred by section 779, need only take CYA determinations into account, and that it had a right to "second guess" CYA. When reminded that section 779 required it to consider the effect of its order on CYA parole and discipline, the court in this case commented "I assure you that I have considered that and I have given it some thought, because I don't think that I should close my mind to the possibilities of my action, I think at the beginning of this hearing I should be aware of what possibilities might occur, what the effect of a court's order might be. [¶] Now, certainly I would agree that a Court should not step in in case after case with the Youth Authority unless there is a serious reason for it."

It is manifest that when the juvenile court grants relief pursuant to sections 778 and 779, and places a ward on probation, it necessarily makes a judgment which CYA is charged with making, based on the same evidence. Such action by the court is tantamount to the granting of parole, again on the basis of the same matters considered by CYA. When as here such court action is taken in response to CYA's refusal to grant parole, it is inescapable the court has substituted its judgment for that of CYA.

The Legislature has not clearly defined the circumstances under which a juvenile court may intervene in a matter concerning the rehabilitative needs of a ward it has committed to CYA. The only express direction is contained in section 779 that the court "shall give due consideration to the effects [of setting aside an order of commitment] upon the discipline and parole system of" CYA, and that the authority to set aside an order of commitment "shall not be deemed to interfere with the system of parole and discharge now or hereafter established by law, or by rule of" CYA. (See fn. 7, *ante.*) CYA thus argues section 779 authorizes a juvenile court to intervene only when to do so does not interfere with CYA's proper administration of paroles and discharges.

Although dealing with revocation rather than granting of parole, support for CYA's position is found in *In re Ronald E.* (1977) 19 Cal.3d

315 [137 Cal.Rptr. 781, 562 P.2d 684]. In that case a juvenile, already a ward of the court committed to CYA, engaged in other criminal activity while on parole. After making initial findings on charges under supplemental petitions (§ 707), but without issuing a dispositional order, the juvenile court referred the matter to CYA "for final disposition." CYA then relied on juvenile court findings in considering the question of parole revocations. We held the juvenile court proceedings were inappropriate to initiate revocation of CYA parole. "Examination of the statutes governing Youth Authority parole and revocation procedure indicates that the juvenile court should play no part in the parole revocation process. The Youth Authority Act provides that the board has the power to grant and revoke parole. (§ 1711.3.) . . . [¶] No role is specified for the juvenile court with respect to revocation of parole. The reason is clear: the Youth Authority Act contemplates that the board or its representative is to conduct the parole revocation hearing, and then itself determine whether a parole violation in fact occurred and take appropriate action with respect to revocation or continuation of parole. The juvenile court is not authorized to act essentially in the role of a Youth Authority parole revocation hearing officer, as it did in this case." (*Id.,* at p. 327.)[8]

While *Ronald E.* deals only with parole revocation, our courts have also held the juvenile court is without jurisdiction to release a ward on parole from CYA. (*Breed* v. *Superior Court* (1976) 63 Cal.App.3d 773, 778 [134 Cal.Rptr. 228].) In so holding the court particularly relied on that provision of section 779 precluding a juvenile court from interfering with the CYA's "system of parole and discharge now or hereafter established by law, or by rule of" CYA. (*Id.,* at pp. 787-788.) The court also stated the "Legislature has properly delegated to the Youth Authority the discretion to determine whether its faculties will be or are of benefit to the ward." (*Id.,* at pp. 784-785.) *Breed* is consistent with our expression in *In re Arthur N.* (1976) 16 Cal.3d 226 [127 Cal.Rptr. 641, 545 P.2d 1345] that commitment to CYA "removes the ward from the direct supervision of the juvenile court" and that it was the function of CYA to determine the proper length of its jurisdiction over a ward. (*Id.,* at pp. 237-238.)

In the related field of jurisdiction to determine the rehabilitative needs of persons convicted of crimes, we have concluded the Adult Authority had the exclusive power to determine questions of rehabilitation. "If . . . the court were empowered . . . to recall the sentence and grant probation if the court found that the defendant had become rehabilitated after his

---

[8]We further held in *Ronald E.* that CYA could not rely "for any purpose"—including purposes of parole revocation—on juvenile court determinations not resulting in appealable orders.

incarceration, there manifestly would be two bodies (one judicial and one administrative) determining the matter of rehabilitation, and it is unreasonable to believe that the Legislature intended such a result." (*Holder* v. *Superior Court* (1970) 1 Cal.3d 779, 782 [83 Cal.Rptr. 353, 463 P.2d 705]; see also *Alanis* v. *Superior Court* (1970) 1 Cal.3d 784, 786-787 [83 Cal.Rptr. 355, 463 P.2d 707].) While different statutes—even different codes—regulate the division of responsibility between the concerned administrative agency and court, it appears to be as unreasonable to assume the Legislature intended that both the juvenile court and CYA are to regulate juvenile rehabilitation as it is to assume that both the superior court and Adult Authority are to regulate criminal rehabilitation.

In view of the foregoing it appears section 779 does not constitute authority for a juvenile court to set aside an order committing a ward to CYA merely because the court's view of the rehabilitative progress and continuing needs of the ward differ from CYA determinations on such matters arrived at in accordance with law. The critical question is thus whether CYA acted within the discretion conferred upon it in rejecting Owen's application for parole. If so, there is no basis for judicial intervention by the juvenile court.

### CONCLUSION

Owen's petition is supported by little more than a showing that after 18 months of confinement he had made good progress toward parole or outright release, that he had legitimate ambitions which he claimed could best be achieved if not confined, and a lone expert opinion that rehabilitation could best be accomplished in some other environment. But even that expert recognized Owen's need for continued psychiatric treatment and acknowledged release might have a detrimental effect upon the therapeutic benefit derived from working toward a regular grant of parole. He also gave conflicting testimony as to whether Owen would continue to benefit by treatment in CYA facilities.

Witnesses for CYA raised serious questions whether Owen had assumed a proper degree of responsibility for his grievous misconduct. They were unanimously of the opinion his early release would tend to be viewed by Owen as approval of such misconduct, thereby damaging rehabilitative efforts. They were also of the view that while Owen had made a good adjustment during his 18 months of commitment, he would continue to benefit by other adjustments, particularly through recognition of the anti-social nature of his offense.

It fairly appears the record in the instant case discloses a debatable question whether Owen's rehabilitative needs could best be served by his continued commitment to CYA. ▮ ▮▮ CYA acted well within law and discretion vested in it by the Legislature in denying Owen's application for parole in 1976.[9] ▮ In enacting section 779 in context with the Youth Authority Act the Legislature did not intend to authorize the juvenile court to substitute its judgment for that of CYA in such circumstances. The fact the question of release is debatable does not invoke judicial intervention—such circumstance tends instead to give conclusive effect to CYA's determination.

Giving meaning to the intendment of section 779 together with policies set forth in the balance of the Youth Authority Act, we hold a juvenile court may not act to vacate a proper commitment to CYA unless it appears CYA has failed to comply with law or has abused its discretion in dealing with a ward in its custody. Section 779 does not authorize judicial intervention into the routine parole function of CYA, as was done in this case.

The order appealed from is reversed.

Mosk, J., Richardson, J., and Manuel, J., concurred.

**BIRD, C. J.**—I must respectfully dissent.

The majority today strip juvenile courts of their statutory power to vacate Youth Authority commitments when, in the court's judgment, such action would be in a ward's best interests. In so holding, the majority override the legislative mandate of Welfare and Institutions Code sections 775, 778 and 779. Adherence to these statutes requires this court to affirm the juvenile court's order.

The Legislature has vested in juvenile courts broad powers to amend dispositional orders. Welfare and Institutions Code section 775, ignored by the majority, provides that "[a]ny order made by the [juvenile] court in

---

[9]Although testimony at the hearing focused on Owen's rehabilitative needs, a second factor which CYA must consider in its decision to release or retain a ward in custody is the safety of the public. (§§ 1700, 1765; see *In re Martinez* (1970) 1 Cal.3d 641, 650 [83 Cal.Rptr. 382, 463 P.2d 734].) Here Owen stipulated to having fired a rifle bullet from a bedroom window into his father's head at a distance of 35 feet. CYA's program was designed not only for Owen's needs, but also to insure the public's safety upon his release, and Owen's failure to accept responsibility for his criminal conduct was a factor which was a legitimate concern to CYA.

the case of any person subject to its jurisdiction may at any time be changed, modified, or set aside, *as the judge deems meet and proper . . . .*"[1] (Italics added.) Further, section 778 allows the ward, a parent, or an interested party to petition the juvenile court to amend or set aside a previous order on the grounds of "new evidence" or "change of circumstance."[2] That same statute provides that the court shall hold a hearing on the petition if it appears that the proposed change may promote the ward's "best interests." Finally, section 779 specifically empowers the juvenile court to "change, modify, or set aside" a previous order committing a minor to the Youth Authority.[3] (See *In re Arthur N.* (1976) 16 Cal.3d 226, 238, fn. 15 [127 Cal.Rptr. 641, 545 P.2d 1345].) These three sections authorize a juvenile court to vacate a Youth Authority commitment whenever changed circumstances convince the court that a different disposition would be in a ward's best interest.

The majority reject this clear grant of authority by focusing on two cautionary statements in section 779. The first requires juvenile court

---

[1]From the italicized language, it is evident that the Legislature intended to give juvenile court judges wide discretion to amend or vacate their previous orders, including dispositional orders.

All statutory references are to the Welfare and Institutions Code.

[2]Section 778: "Any parent or other person having an interest in a child who is a ward of the juvenile court or the child himself through a properly appointed guardian may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a ward of the juvenile court for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. The petition shall be verified and, if made by a person other than the child, shall state the petitioner's relationship to or interest in the child and shall set forth in concise language any change of circumstance or new evidence which are alleged to require such change of order or termination of jurisdiction.

"If it appears that the best interests of the child may be promoted by the proposed change of order or termination of jurisdiction, the court shall order that a hearing be held and shall give prior notice, or cause prior notice to be given, to such persons and by such means as prescribed by Sections 776 and 779, and, in such instances as the means of giving notice is not prescribed by such sections, then by such means as the court prescribes."

[3]Section 779 provides in pertinent part: "The court committing a ward to the Youth Authority may thereafter change, modify, or set aside the order of commitment. Ten days' notice of the hearing of the application therefor shall be served by United States mail upon the Director of the Youth Authority. In changing, modifying, or setting aside such order of commitment, the court shall give due consideration to the effect thereof upon the discipline and parole system of the Youth Authority or of the correctional school in which the ward may have been placed by the Youth Authority. Except as in this section provided, nothing in this chapter shall be deemed to interfere with the system of parole and discharge now or hereafter established by law, or by rule of the Youth Authority, for the parole and discharge of wards of the juvenile court committed to the Youth Authority, or with the management of any school, institution, or facility under the jurisdiction of the Youth Authority. Except as in this section provided, nothing in this chapter shall be deemed to interfere with the system of transfer between institutions and facilities under the jurisdiction of the Youth Authority."

judges who amend or vacate a commitment order to "give due considera-tion to the effect thereof upon the discipline and parole system of the Youth Authority . . . ." However, the absence of prohibitory language in the sentence underscores the fact that the Legislature did not intend to prevent juvenile courts from setting aside commitment orders. Rather, the Legislature merely sought to have the court deliberate upon the effect of vacating a commitment, to insure that the court does not hastily or unnecessarily interfere with parole determinations.[4]

The majority also focus on the fourth sentence of section 779. There, after having given juvenile courts the power to set aside Youth Authority commitments, the Legislature states: "*Except as in this section provided,* nothing in this chapter shall be deemed to interfere with the [Youth Authority's] system of parole and discharge . . . ." (Italics added.) It is curious that in describing this provision, the majority omit reference to the italicized introductory clause.[5] (Maj. opn., *ante,* p. 403.) That clause plainly signifies a legislative recognition that by authorizing juvenile courts to set aside commitment orders, the Legislature was creating an exception to the Youth Authority's exclusive discretion in parole matters. If the Legislature had not intended to allow the exercise of judicial discretion in this area, it would not have written the introductory clause. In omitting that clause from their analysis, the majority are less than faithful to the plain language and meaning of the statute.

To reach their result, the majority also take great liberty with the case law. The majority quote *In re Arthur N., supra,* 16 Cal.3d at pages 237-238 for the proposition that commitment to the Youth Authority "removes the ward from the direct supervision of the juvenile court." (Maj. opn., *ante,* p. 404.) However, the majority ignore the footnote qualifying that statement: "The court may, however, set aside the commitment on notice and hearing and return the minor to the former wardship status. (§ 779.)" (16 Cal.3d at p. 238, fn. 15.)

---

[4]In this case, the judge expressly considered the effect of his order. He acknowledged that "a court should not step in in case after case with the Youth Authority unless there is a serious reason for it." He concluded that under the proper circumstances, vacating an earlier commitment would not intrude on the Youth Authority's parole system or treatment plan.

[5]It is also curious that the majority overlook section 1704, which provides that "[n]othing in [the Youth Authority Act] shall be deemed to interfere with or limit the jurisdiction of the juvenile court." Under this provision, the Legislature's grant of discretion in parole matters to the Youth Authority (§§ 1711.3, 1765, 1766) cannot be deemed to interfere with or limit the juvenile court's continuing jurisdiction over wards committed to the Youth Authority (§ 607). Yet this is precisely what the majority do in holding that the juvenile court's jurisdiction to set aside a commitment order is limited to situations where the Youth Authority has abused its discretion.

Further, the majority's summary description of *Breed* v. *Superior Court* (1976) 63 Cal.App.3d 773 [134 Cal.Rptr. 228], on which they heavily rely, is misleading. (Maj. opn., *ante,* p. 404.) In *Breed,* the Youth Authority returned a difficult ward to the juvenile court. After the court declined to set aside the original order committing the ward to the Youth Authority, the Youth Authority refused to accept his return. The juvenile court then released the ward from his interim custody until the Youth Authority agreed to accept his return.

On these facts, the Court of Appeal held that the juvenile court's temporary release of the minor was "a technical error" since section 779 prohibits juvenile courts from interfering with the Youth Authority's system of discharge *except* where the court changes, modifies or sets aside the original order of commitment. (*Id.,* at pp. 781, 788.) The ward's release in *Breed* did not result from a change, modification, or setting aside of the original commitment. Indeed, the judge expressly declined to do so. (*Id.,* at pp. 782, 785.) Thus, *Breed* differs critically from this case and in no way limits the power of juvenile courts to discharge wards from the Youth Authority under the first sentence of section 779.[6]

Again, in citing *In re Ronald E.* (1977) 19 Cal.3d 315 [137 Cal.Rptr. 781, 562 P.2d 684], the majority rely on a case which is inapposite. *Ronald E.* holds that in the absence of authorizing legislation, parole revocation proceedings may not be initiated in juvenile court. (*Id.,* at p. 326.) This holding is entirely consistent with the juvenile courts' power to set aside Youth Authority commitments since section 779 expressly authorizes such action.

Finally, the majority seek support in *Holder* v. *Superior Court* (1970) 1 Cal.3d 779 [83 Cal.Rptr. 353, 463 P.2d 705] and *Alanis* v. *Superior Court* (1970) 1 Cal.3d 784 [83 Cal.Rptr. 355, 463 P.2d 707]. *Holder* and *Alanis* are readily distinguished from the present case since they both involve interpretation of the adult sentencing law as opposed to the Juvenile Court Law. The adult law includes no provisions comparable to sections 775, 778 and 779. The courts' broad powers to change *juvenile* disposi-

---

[6]The majority also quote out of context *Breed's* statement that "[t]he Legislature has properly delegated to the Youth Authority the discretion to determine whether its facilities will be or are of benefit to the ward." (*Id.,* at p. 785; maj. opn., *ante,* p. 404.) The majority omit the statutory authority *Breed* cites for this proposition: sections 736 and 780. These statutes respectively describe (1) the kinds of persons whom the Youth Authority shall accept (§ 736), and (2) the kinds of persons whom the Youth Authority may return to the committing court (§ 780). Neither provision is involved in this case. Neither provision in any way limits section 779's grant of authority to juvenile courts to set aside an original order committing a minor to the Youth Authority.

tions under these sections are in keeping with the special concern of the Juvenile Court Law with the welfare and rehabilitation of young people under its jurisdiction. (§ 202; see, e.g., *T.N.G.* v. *Superior Court* (1971) 4 Cal.3d 767, 775 [94 Cal.Rptr. 813, 484 P.2d 981].)

Clearly, the case law does not support the majority's conclusion that the Legislature did not mean what it plainly stated in sections 775, 778 and 779. These statutes give juvenile courts the authority to set aside Youth Authority commitments to promote a ward's best interests. Nothing in these statutes purports to limit this power to situations where the Youth Authority "has failed to comply with law or has abused its discretion." (Maj. opn., *ante,* p. 406.) To the contrary, the *court* is accorded great discretion in determining whether the circumstances justify a change in disposition or total termination of the court's jurisdiction.[7] (See fn. 1, *ante*; *In re W.R.W.* (1971) 17 Cal.App.3d 1029, 1037 [95 Cal.Rptr. 354].) "[I]n the absence of a clear showing of abuse of discretion, an appellate court is not free to interfere with the trial court's order." (*In re Corey* (1964) 230 Cal.App.2d 813, 831-832 [41 Cal.Rptr. 379].)

In the present case, a review of the evidence establishes that the juvenile court did not abuse its broad discretion in finding "a very great change of circumstances" and in setting aside Owen's Youth Authority commitment. The annual review made by Owen's immediate supervisors at the Youth Authority indicated that Owen had made "superior progress" in achieving the goals set in his rehabilitation program, and that his schoolwork was "outstanding." The report also stated that Owen "possessed leadership qualities," avoided negative influences, and was a "self-starter." The report concluded that "he should have no problem whatsoever maintaining any job he should happen to have." Owen's evaluators recommended his release.

In addition, a psychiatrist testifying on Owen's behalf stated that Owen had arrived at a philosophical understanding of his role in his father's death and that the chance of a recurrence of such violence was remote. The Youth Authority's experts agreed that the killing was an isolated incident and that Owen was not a hazard to the community.

Further, the evidence was uncontradicted that Owen had the potential ability to play professional baseball. However, the Youth Authority facilities where he was confined were inadequate to develop this talent.

---

[7] Indeed, the court has a *duty* to terminate its jurisdiction when it becomes convinced on the evidence that the ward no longer requires the court's supervision. (See, e.g., *In re Francecisco* (1971) 16 Cal.App.3d 310, 314 [94 Cal.Rptr. 186].)

On this record, it is clear that substantial evidence supported the trial judge's determination in this case. The evidence showed that Owen had made significant progress in the Youth Authority, that he was not a threat to the safety of the public, and that his educational and professional opportunities would be enhanced by his release. Experts for both Owen and the Youth Authority testified that denial of release could impede his progress. The trial court's decision to set aside the Youth Authority commitment and to order outpatient psychiatric care for Owen was well within its discretion.

The trial court's order should be affirmed.

Tobriner, J., and Newman, J., concurred.

Respondent's petition for a rehearing was denied March 29, 1979. Bird, C. J., and Tobriner, J. were of the opinion that the petition should be granted.