[No. G015800. Fourth Dist., Div. Three. Jan. 31, 1996.]

THE PEOPLE, Plaintiff and Appellant, v.
RYAN LO, Defendant and Respondent.

**COUNSEL**

Michael R. Capizzi, District Attorney, Maurice L. Evans, Chief Assistant District Attorney, Wallace J. Wade, Assistant District Attorney, David L. Himelson and E. Thomas Dunn, Jr., Deputy District Attorneys for Plaintiff and Appellant.

Gary L. Proctor and Thomas H. Wolfsen for Defendant and Respondent.

**OPINION**

**SILLS, P. J.**—The People appeal an order returning Ryan Lo to the California Youth Authority (CYA) after its Youthful Offenders Parole Board (the board) found him an inappropriate candidate for CYA treatment and returned him for resentencing under Welfare and Institutions Code section 1737.1. The court previously committed Lo to CYA following his conviction for first degree murder. In response to CYA's return of Lo, the sentencing court sent him back, over the People's objection. The People contend the court was without authority to do anything but one of the two enumerated alternatives in the statute, neither of which permits a return. We agree and reverse.

## FACTS

Seventeen-year-old Ryan Lo was tried by the court—along with one of two confederates—for the heinous, cold-blooded murder of Damian

McKenna. Lo lured McKenna to a remote area and shot him twice in the head. Fearing McKenna was not dead, he then smashed McKenna's head with a rock. Lo, who was in the company of 19-year-old Jonathan Lee Freshour[1] at the time of the crime, committed the acts resulting in the death. He was solicited to commit the crime by 16-year-old Destinni Mardesich, McKenna's former girlfriend—and mother of McKenna's minor child—who feared McKenna would attempt to obtain custody of their son.

Lo and Mardesich bragged about the murder to others before they were caught, then laughed about the killing when they were placed in the same room after their arrest. Lo and Mardesich, tried as adults, were convicted of premeditated murder in their joint court trial, and Freshour was convicted in a separate proceeding.

In the CYA diagnostic evaluation of Lo prepared before sentencing, it concluded—in a *very* hesitant fashion—that he was amenable to treatment at CYA.[2] However, this assessment included the comment that "he would be seen by the [the board] each year for progress. If his behavior was not appropriate and he were not making the necessary progress, there is a great likelihood that the parole board would order him back to court for resentencing to state prison." That possibility was actually cited by Lo's counsel at sentencing as a reason in favor of a CYA commitment: if Lo failed to positively respond, then CYA had the irreproachable remedy of returning him. The court cited it as well to motivate Lo towards taking advantage of the opportunities of rehabilitation available only at CYA.

Nine months after being committed to CYA for the maximum term of twenty-nine years to life,[3] Lo's first hearing before the board resulted in a new order returning him to court under Welfare and Institutions Code

---

[1]We affirmed Freshour's conviction for murder in an unpublished opinion. (*People* v. *Freshour* (June 15, 1994) G014213.)

[2]Not only did the psychiatric evaluation state, "[Lo] appears to have a well-established character trait that would not likely be significantly modified by programs offered at CYA[,]" but the social history included the fact Lo still denied responsibility for the crime, denying "the intention to kill the victim. He claim[ed] still to only have wanted to scare him. The gun was brought along because he knew the victim was armed. . . . [¶] Lo admits to having a long[-]standing alcohol and drug abuse pattern and also acknowledges sales of drugs. He maintains he kept all this from his mother and well-meaning friends."

[3]Irrespective of the maximum term ordered, Welfare and Institutions Code sections 1731.5, subdivision (c) and 1769, subdivision (b) require any CYA inmate be released no later than his or her 25th birthday.

sections 780[4] and 1737.1.[5] The reasons for the order read, "victim impact, formal drug program and education [*sic*]. Ward committed a well-planned-out murder of the victim. Although he lacks prior criminal sophistication, he appears to be manipulative and capable of any level of crimes. [The board] noted drug sales and highly sophisticated games he played with friends similar to cult activity. [The board] does not oppose housing in CYA as a [California Department of Corrections] inmate, but believes that 5-1/2 years is an insufficient time period to truly observe and assess ward's threat to public safety. Ward's apparent maturity level was also considered by the panel. He has a high school diploma and scored at the [very high] academic level. *The mental health reports do not indicate a significant need for psychological or psychiatric treatment. Ward's behavior and crime indicates a need for adult treatment and no real justification to protect him from adult offenders in the Department of Corrections.* Ward's attorney, mother and aunt were given the opportunity to address panel. They gave no information to counter the panel's decision." (Italics added.)

The lower court received this order along with a letter informing it of the return order and referencing the "case report dated August 10, 1993." The letter requested that the court inform the board of the date of the

---

[4]Welfare and Institutions Code section 780 states, "If any person who has been committed to the Youth Authority appears to be an improper person to be received by or retained in any institution or facility under the jurisdiction of the Youth Authority or to be so incorrigible or so incapable of reformation under the discipline of any institution or facility under the jurisdiction of the Youth Authority as to render his or her retention detrimental to the interests of the Youth Authority, the Youthful Offender Parole Board may order the return of such person to the committing court. However, the return of any person to the committing court does not relieve the Department of the Youth Authority of any of its duties or responsibilities under the original commitment, and such commitment continues in full force and effect until it is vacated, modified, or set aside by order of the court. [¶] When any such person is so returned to the committing court, his or her transportation shall be made, and the compensation therefor paid, as provided for the execution of an order of commitment."

[5]Welfare and Institutions Code section 1737.1 states, "[w]henever any person who has been convicted of a public offense in adult court and committed to and accepted by the Youth Authority appears to the Youthful Offender Parole Board, either at the time of his or her first appearance before the board or thereafter, to be an improper person to be retained by the Youth Authority, or to be so incorrigible or so incapable of reformation under the discipline of the Youth Authority as to render his or her detention detrimental to the interests of the Youth Authority and the other persons committed thereto, the board may order the return of such a person to the committing court. The court may then commit the person to a state prison or sentence him or her to a county jail as provided by law for punishment of the offense of which he or she was convicted. The maximum term of imprisonment for a person committed to a state prison under this section shall be a period equal to the maximum term prescribed by law for the offense of which he or she was convicted less the period during which he or she was under the control of the Youth Authority. This section shall not apply to commitments from juvenile court. [¶] As used in this section 'period during which he or she was under the control of the Youth Authority' means the period of time during which he or she was physically confined in a state institution by order of the Youth Authority or Youthful Offender Parole Board."

resentencing. The resentencing date was set, but the trial court decided not to inform the board of it because "it would be improper [to contact the board's officer] so I didn't." Thus, no one from CYA or the board was present at resentencing.

Defense counsel opined in his pleading to the resentencing court that the board's action was strictly a result of political pressure brought to bear on CYA by the Sheriff of Orange County and the district attorney. Counsel contended the sheriff and the district attorney inappropriately wrote letters revealing their dissatisfaction with the trial court's leniency in granting Lo and Mardesich CYA commitments.[6] Subsequent to these two letters, the board's hearing was first set, then reset twice before it was actually conducted. Counsel attended the hearing—as indicated in the board's order—and related to the resentencing court that it was nothing more than a "political lynching."[7]

---

[6]The letter sent to CYA by Orange County Sheriff Brad Gates reiterated the facts of the case against Lo, Mardesich and Freshour. Gates then explained his disagreement with the decision based on the complicated preparation and cold-blooded calculation with which the murder was executed, and the way all three then laughed about it afterwards. He focused on Lo as having a history and reputation for drug dealing and violence. Finally, Gates concluded with "my hope [is] that after considering all of the appropriate information submitted to the Board that you will find [Lo and Mardesich] unfit for [CYA] and find them more suitable for State Prison."

District Attorney Michael Capizzi's letter—directed to Thomas Blay in the intake division of CYA—stated its authority rested in California Code of Regulations, title 15, section 4169. Capizzi focused on the social workers who favored CYA treatment for Lo and Mardesich and who appeared to accept the defendants' self-serving representations that things "just got out of hand." Those in favor of treating Lo and Mardesich at CYA were so primarily because neither defendant had ever been given the opportunity at rehabilitation previously. In summary, Capizzi "recommend[s] and urge[s CYA] to reject the proffered commitment of these two murderers to [CYA] and return them to Orange County Superior Court for commitment to state prison. . . ."

California Code of Regulations, title 15, section 4169 states, "The committing court, probation department, district attorney, defense attorney and law enforcement agencies are requested to provide the Youth Authority with additional information or recommendations they deem necessary or desirable to assist the Authority in carrying out its functions." This regulation follows those provisions structuring the receipt of an inmate at CYA after a commitment from an adult criminal court, as distinct from a commitment from the juvenile court. (See Cal. Code Regs., tit. 15, §§ 4168-4178.5.)

[7]Defense counsel alleged he had received information from Lo's mother and unnamed CYA staff members that Lo was "being set up" and "being singled out" by someone on the board who "had continued this case twice, apparently, to line up these other people of a similar ilk and mind-set . . . ." Counsel summed up the hearing as nothing more than a grilling of Lo, comprised of "45 minutes of talking down to him about how the community was outraged at what had happened, how they'd gotten letters from the sheriff, how they'd gotten letters from the district attorney and all the victims and how everyone wanted him to go to prison. . . ." Counsel presented nothing to support these allegations nor has he prepared any record for appeal.

At resentencing, the trial court received defense counsel's opinion of the hearing, accepted counsel's allegation there were no new facts presented at the hearing—except, perhaps, the unnamed staff member's desire to continue working with Lo—and then stated it was "upset and angry." Objecting to the board's letter as not containing any information, the court took umbrage with the return: "[I]t bothers me. And maybe I'm being bothered too much and it's not proper for me to take it into consideration, but I get a letter, I get this correspondence with absolutely nothing on December 23rd. [*sic*] And I guess their position is I don't have any say-so. If it's recommended this was to resentence the individual, I resentence him and I have no choice, that's the end of it. [¶] But it seems to me that I'm really troubled by a situation where, out of the blue, we get letters from—after the fact and so forth. And Mr. Gates and Mr. Capizzi, they have a perfect right to come and make their pitch and tell me what they felt." Conceding Welfare and Institutions Code section 1737.1 "doesn't literally say that I have the option of letting him remain at the Youth Authority and so forth. . . . [I]f the appellate court, where I'm sure this is going to go, they may agree or disagree with what I'm going to do, it seems to me that this is purely—he was accepted by the California Youth Authority, apparently everything was going fine. [¶] . . . . I thought of ordering the whole thing up here. Maybe they will come down and say, fine, judge, you sentence this individual and that's the end of the ballgame and you have no right. . . . You have no discretion and you can't send him back to the Youth Authority and it's in excess of your judicial power and that's it. [¶] But it seems to me that this is—just smacks so openly of just political pressure being put on the parole board. . . . the sheriff and the District Attorney, appears to me that's the only thing. They wrote letters. [¶] . . . [¶] . . . [T]his is just a blatant attempt to resentence, possibly judge shop. . . . [¶] I think it was a case where the recommendation could have been that he goes to state prison. If he had, he would have gone to state prison. [¶] I put a lot of weight in [the initial CYA evaluation] and the staff does all this work and it just seems to me that the [board] and that's—it can take Mr. Capizzi's letter and Sheriff Gates' letter and basically I think that is basically the impetus to get this going. . . . It's a political decision to get the board to go ahead and put the screws on it. I think he was singled out. You can go to the U.S. Supreme Court on equal protection. I think he [*sic*] singled him out. . . ." The court sent Lo back to CYA because "the board has absolutely no basis for their conclusion. . . . [¶] Certainly no facts are presented, and I agree that the statute says no facts need to be presented, but it seems to me that trying to modify and set aside this particular sentence, it was just—it's a rehash of what I already did. [¶] I don't know why I want to resentence him. I'm going to send him right straight back to the Youth Authority and I will not vacate and set aside and so forth. If I'm wrong, I'm wrong, but this isn't a close call for me. . . . [¶] I refuse to vacate my original commitment, but [even so] I'll recommit him. . . . I don't know if the proper way is to not to vacate, refuse to vacate and resentence, or to recommit. I'll do either or both . . . ."

## DISCUSSION

### A. *Appealability of the Order*

■ We must first address the question of whether the People possess the statutory right to appeal the trial court's action.[8] Although the record is somewhat confusing, the court intended to order Lo back to CYA following the board's order under Welfare and Institutions Code section 1737.1 that he be resentenced. Thus, it must be treated as an order or resentence following the board's decision to return Lo.

Penal Code section 1238 specifies when the People may appeal. In subdivision (a)(10), the prosecution is granted the right to appeal an "unlawful sentence . . . ." But, as Lo notes, one must resolve the underlying contention of the lawfulness of the sentence before the initial question of appealability can be answered. Moreover, Lo contends, the judgment in his case occurred almost a year before this hearing giving rise to the People's complaint; the trial court refused to vacate its original commitment, thus rendering this appeal to be from a judgment occurring far too distant in time.

Another provision of Penal Code section 1238, however, satisfies the need for statutory authorization. Subdivision (a)(5) permits the appeal of an "order made after judgment, affecting the substantial rights of the people." The order returning Lo to CYA—or refusing to resentence after a return from the board—is such an order. That refusal to resentence "substantially affected" the People's rights, resulting in Lo's facing the district attorney as his opponent on appeal, instead of the board or CYA. Lo tactically chose not to pursue an administrative appeal of the board's order before arriving back before the superior court, thus indirectly contributing to the selection of his appellate adversary.

In a closely analogous situation, an appeal was properly taken by the prosecution from an order "redelivering" a defendant to the California Rehabilitation Center following its director's decision to exclude the defendant as unsuitable under Welfare and Institutions Code section 3053.[9] (*People v. Toscano* (1977) 69 Cal.App.3d 140,146 [137 Cal.Rptr. 893]; *People v.*

---

[8]We note as a tangential issue that the People are not restricted to premising their appeal on a sole subdivision of Penal Code section 1238 listed in their notice of appeal. Appellants are no longer limited to specific issues cited in a notice of appeal. (See *People v. Hoffard* (1995) 10 Cal.4th 1170, 1179 [43 Cal.Rptr.2d 827, 899 P.2d 896].)

[9]Welfare and Institutions Code section 3053 states, in pertinent part, "(a) If at any time following receipt at the facility of a person committed pursuant to this article, the Director of Corrections concludes that the person, because of excessive criminality or for other relevant

*Munoz* (1973) 31 Cal.App.3d 87, 90 [107 Cal.Rptr. 451]; see also 6 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Appeal, § 3182, p. 3936.) Likewise, this order is appealable.

### B. *The Validity of the Court's Response to the Board's Order*

The People appeal the trial court's response to the board's order, contending the court did not have the authority to *ignore* the board's decision and return Lo to CYA. Lo responds that as the sentencing court, it possessed the inherent power to dispense justice in its sentence as it deemed best.

Both parties focus on *Breed* v. *Superior Court* (1976) 63 Cal.App.3d 773 [134 Cal.Rptr. 228] as authority for their respective positions. Lo contends *Breed* authorizes a trial court's refusal to modify, vacate or set aside a commitment of a juvenile to CYA even though the board has returned him as unsuitable under Welfare and Institutions Code section 1737.1. On the other hand, the People cite *Breed* as the motivating reason behind a major revision in the statute effective the following year. They interpret the *present* statute to mean the trial court no longer has the authority to return to CYA an *adult* previously committed to CYA but excluded under Welfare and Institutions Code section 1737.1.

The pertinent provision of Welfare and Institutions Code 1737.1 states, "[t]he court may then commit the person to a state prison or sentence him or her to a county jail as provided by law for punishment of the offense of which he or she was convicted. The maximum term of imprisonment for a person committed to a state prison under this section shall be a period equal to the maximum term prescribed by law for the offense of which he or she was convicted less the period during which he or she was under the control of the Youth Authority. . . ." The parties essentially ask us whether the two alternatives presented in the statute are the *exclusive* judicial responses to the board's decision to return an inmate.

In *Breed,* the director of CYA sought a writ of prohibition to restrain the juvenile court from enforcing its order sending 18-year-old John G. *back* to

reason, is not a fit subject for confinement or treatment in such narcotic detention, treatment and rehabilitation facility, he shall return the person to the court in which the case originated for such further proceedings on the criminal charges as that court may deem warranted.

"(b). . . . . . . . . . . . . . . . . . . . . . . . . .

"(c) If the defendant was originally committed pursuant to section 3050 or 3051, the committing court, if the criminal proceedings were conducted in another court, shall notify that court which adjourned its criminal proceedings or suspended sentence in such case pending the civil commitment. In such event, that criminal court shall then promptly set for hearing the matter of the sentencing of the defendant upon the conviction which subsequently resulted in the original civil commitment."

CYA after he was returned under Welfare and Institutions Code section 1737.1. That statute partially read at the time, "[w]henever any person who has been charged with or convicted of a public offense and committed to the authority appears to the authority, either at the time of his presentation or after having become an inmate of any institution or facility subject to the jurisdiction of the authority, to be an improper person to be retained in any such institution or facility, or to be so incorrigible or so incapable of reformation under the discipline of the authority as to render his detention detrimental to the interests of the authority and the other persons committed thereto, the authority may return him to the committing court. . . . In the case of a person who has been committed to the authority by a juvenile court, the juvenile court to which he is returned may make such further order or commitment with reference to such person as may be authorized by the juvenile court law, *except that said court may not recommit such person to the Youth Authority.*" (Italics added.)

The juvenile court committed John to CYA for brandishing a knife at two women and resisting arrest. His criminal record was a "mile" long, including an attempted sexual assault when he was seven years old and previous commitments to CYA, first for a series of burglaries, and then for robbery and assault. The latest commitment occurred when he was 17, and CYA returned him a year later. Following his return, the probation department referred him for a psychiatric evaluation to see if a commitment for a mental disorder was appropriate. Each of the psychiatrists noted he *might* have a mental disorder, but no symptoms of such were apparent at the time.

The juvenile court was at a loss for options. Because of *Breed* v. *Jones* (1975) 421 U.S. 519 [44 L.Ed.2d 346, 95 S.Ct. 1779], a juvenile could not be prosecuted in adult court—i.e., sentenced or resentenced—after a finding of guilt in a juvenile court. Once found guilty as a minor, a " '[c]ommitment to the Youth Authority [was] the placement of last resort for juvenile offenders. [Citation.]' [Citation.] Yet on the other hand section 1737.1 announces a legislative policy that the juvenile court may not recommit to the Youth Authority a person returned to the court pursuant to the provisions of that section. The juvenile court, having tried without success other lesser dispositions available to it, properly asks, what disposition can it make?" (*Breed* v. *Superior Court, supra,* 63 Cal.App.3d at p. 780.)

Due to the statutory language of Welfare and Institutions Code section 1737.1—which, at that time, specifically prohibited the *juvenile* court from returning a minor to CYA (*Breed* v. *Superior Court, supra,* 63 Cal.App.3d at p. 777, fn. 3)—the court had no options available to it to care for or incarcerate John. The appellate court, in attempting to fashion a resolution to

the problem—as the Legislature had not, as yet, done—focused on the separation of powers between the executive and judicial branches mandated by the Constitution. Relying on *People* v. *Tenorio* (1970) 3 Cal.3d 89 [89 Cal.Rptr. 249, 473 P.2d 993],[10] the *Breed* court determined the judiciary's functions could not constitutionally be conditioned on the consent of the executive in the manner Welfare and Institutions Code section 1737.1 had constructed. The *Breed* court held the juvenile court properly refused to vacate its order sending John to CYA because the original order remained in effect until the court modified it. CYA did not have the power to essentially co-opt the court in its function of determining what was the best disposition of the case.

It is unnecessary to resolve the parties' differing interpretations of *Breed* to decide this appeal. The Supreme Court has approached an analogous question and resolved it in another way. *In re Owen E.* (1979) 23 Cal.3d 398 [154 Cal.Rptr. 204, 592 P.2d 720] established that the legislative scheme provided in Welfare and Institutions Code sections 778-780 and 1737-1737.1 properly allots different powers and responsibilities between CYA and the courts which commit individuals to it.[11] Owen E. was committed to CYA as a juvenile after he shot and killed his father at the age of 17. He was accepted by CYA and spent 18 months undergoing regular educational treatment, "making normal progress towards rehabilitation." (23 Cal.3d at p. 400.) He appeared before the board but was denied parole. He—via his mother—petitioned the court under Welfare and Institutions Code section

---

[10]*People* v. *Tenorio, supra,* 3 Cal.3d 89 held that a sentencing court could not be hampered in its judicial function by the "consent" of the prosecution before striking a prior conviction enhancement. This decision was essentially abrogated by the amendment to Penal Code section 1385, adding subdivision (b), which specifically denied the court the power to strike prior conviction allegations and has been upheld repeatedly against constitutional attack. (See *People* v. *Tanner* (1979) 24 Cal.3d 514, 519, fn. 3 [156 Cal.Rptr. 450, 596 P.2d 328]; *People* v. *Valencia* (1989) 207 Cal.App.3d 1042, 1045 [255 Cal.Rptr. 180].)

[11]See also *People* v. *Najera* (1990) 222 Cal.App.3d 1507, 1514 [272 Cal.Rptr. 413]: "Section 1737.1 . . . provides a means for [the board] to *order* the recall of a ward it considers to be incorrigible or incapable of reform. While some of the criteria which may be used by the board to determine whether a ward is 'incapable of reform' are the same as those used by the director to determine whether the ward will 'materially benefit' from further commitment, other factors come into consideration by the board. The board focuses on the ward's behavior during his commitment, and whether that behavior is detrimental to the interests of the Youth Authority and other persons committed there. It considers, for example, whether the ward has physically attacked other youths or staff, inflicted property damage, forced others to commit crimes, possessed unlawful weapons, or persisted in violating institutional rules. (Cal. Code Regs., tit. 15, § 4179.5.) [¶] It is apparent from a plain reading of [sections 1737 and 1737.1] that two separate procedures are contemplated. In the first, the court may recall a commitment and resentence a person based upon the Youth Authority's recommendation that he will no longer materially benefit from the commitment. In the second, the parole board may order a recall and resentencing if it determines the person's behavior is detrimental to the interests of the Youth Authority. . . ."

778, contending the board improperly denied him parole. The juvenile court reviewed the same information which had resulted in the board's conclusion that further treatment at CYA was essential, but reached the opposite conclusion: Owen's "rehabilitative needs would best be satisfied if he were released from custody." (23 Cal.3d at p. 401.) An impasse was reached in Owen's case: which authority was controlling on the issue of the CYA inmate's continuation at CYA? Owen "in effect [sought] to establish the juvenile court's superior authority to reconsider and overrule a discretionary determination made by CYA pursuant to authority vested in CYA by the Legislature[,]" namely, the determination of "the rehabilitative needs of a ward [the court] has committed to CYA." (*Id.* at pp. 401-403.)

The Supreme Court rejected Owen's argument and, quoting from *Breed*, held that the " 'Legislature has properly delegated to the Youth Authority the discretion to determine whether its [facilities] will be or are of benefit to the ward.' " (23 Cal.3d at p. 404, quoting *Breed* v. *Superior Court, supra*, 63 Cal.App.3d at pp. 784-785.) The court analogized CYA's authority with that of the Adult Authority having "the exclusive power to determine questions of rehabilitation" for those sentenced to prison. (*Ibid.*) The court concluded that Welfare and Institutions Code section 779[12] failed to accord a power to the court which superseded that of the CYA whenever "the [trial or juvenile] court's view of the rehabilitative progress and continuing needs of the ward differ from CYA determinations on such matters arrived at in accordance with law." (23 Cal.3d at p. 405.) The Legislature properly divided the responsibilities between the courts and CYA, granting the power to decide whether CYA *can* treat an individual to CYA.

Once it is legally decided, under the standards established for it in California Code of Regulations, title 15, sections 4168-4178.5, that the defendant is not a proper person for CYA treatment, the trial court must

[12]Welfare and Institutions Code section 779 states, "The court committing a ward to the Youth Authority may thereafter change, modify, or set aside the order of commitment. Ten days' notice of the hearing of the application therefor shall be served by United States mail upon the Director of the Youth Authority. In changing, modifying, or setting aside such order of commitment, the court shall give due consideration to the effect thereof upon the discipline and parole system of the Youth Authority or of the correctional school in which the ward may have been placed by the Youth Authority. Except as in this section provided, nothing in this chapter shall be deemed to interfere with the system of parole and discharge now or hereafter established by law, or by rule of the Youth Authority, for the parole and discharge of wards of the juvenile court committed to the Youth Authority, or with the management of any school, institution, or facility under the jurisdiction of the Youth Authority. Except as in this section provided, nothing in this chapter shall be deemed to interfere with the system of transfer between institutions and facilities under the jurisdiction of the Youth Authority. [¶] However, before any inmate of a correctional school may be transferred to a state hospital, he shall first be returned to a court of competent jurisdiction and, after hearing, may be committed to a state hospital for the insane in accordance with law."

accept such an inmate's return. The question remains who is to decide, and under what standards, whether the CYA or the board's decision was legally made. *Owen E.* noted there are administrative remedies which should be exhausted prior to any judicial review of an agency's action. (*In re Owen E.*, *supra*, 23 Cal.3d at p. 400; see e.g., *Chaparro* v. *Superior Court* (1990) 218 Cal.App.3d 560, 563-564 [267 Cal.Rptr. 181] [appellate record reflecting full history of CYA inmate returned by the board under Welf. & Inst. Code, § 1737.1 because he was a threat to public safety; as this was not a ground for return under § 1737.1, the board's order treated as a petition under § 1780 to commit him to prison to serve full term.].) Such administrative remedies would have eliminated the procedural quagmire Lo and the People now face. For instance, had Lo appealed the board's decision administratively, he would be facing that body as his appellate adversary. Instead, he chose not to appeal the decision administratively and argued to the *sentencing* court that *it* should refuse to accept the board's order.

An administrative review of the board's hearing is authorized for development under Welfare and Institutions Code section 1721.[13] The administrative appellate process is fully described and delineated in California Code of Regulations, title 15, sections 4935-4940,[14] under the mandate accorded by Welfare and Institutions Code section 1721, subdivision (e). Had Lo invoked that process promptly, the trial court would have had a basis for conducting a judicial review of the hearing rather than attempting to assess a hearing of which it had no record.[15] In *Owen E.*, the Supreme Court rejected Owen's "petition [because it was] supported by little more than a showing

[13]Welfare and Institutions Code section 1721, subdivision (a) states, "The [board] shall adopt policies governing the performance of its functions by the full board, or, pursuant to delegation, by panels, or referees." Subdivision (e) of the same section states, "The board shall adopt rules under which a person under the jurisdiction of the Youth Authority or other persons, as specified in such rules, may appeal any decision of a case hearing representative. The board shall consider and act upon the appeal in accordance with such rules."

[14]California Code of Regulations, title 15, section 4935 describes an appeal of the board's order as "a written request to the Chairman for relief from any Board order or policy which affects an individual ward. . . ." Section 4936 provides the grounds for which an appeal may be taken, such as "[t]he decision of the Board was contrary to law or Board policy. . . ." Section 4937 establishes the different appeal bodies and its hierarchy. Section 4938 denotes the time limits for filing such appeals; an individual ward, however, can file an appeal at any time as "[t]here is no time limit for filing initial appeals by appellants. . . ." Because of this provision, Lo informed us he filed an appeal simultaneous with his filing his supplemental brief in this appeal. This appellate request was denied by the executive officer of the board because Lo continued to be a ward of CYA in response to the superior court order returning him there. Thus, Lo's administrative appeal—which requested reversal of the October 5, 1993, order returning him to superior court from CYA—was unnecessary as earlier "orders are of no impact other than as a historical record of the prior actions of the [board] regarding Mr. Lo."

[15]We note the trial court included the letter, the order and the "case report" conveyed to it by the board. It contains the initial evaluation report and the reports prepared when Lo first

that after 18 months of confinement he had made good progress toward parole or outright release[;] that he had legitimate ambitions which he claimed could best be achieved if not confined[;] and a lone expert opinion that rehabilitation could best be accomplished in some other environment. . . . [¶] Witnesses for CYA raised serious questions whether Owen had assumed a proper degree of responsibility for his grievous misconduct. They were unanimously of the opinion his early release would tend to be viewed by Owen as approval of such misconduct, thereby damaging rehabilitative efforts. They were also of the view that while Owen had made a good adjustment during his 18 months of commitment, he would continue to benefit by other adjustments, particularly through recognition of the antisocial nature of his offense." (*In re Owen E., supra,* 23 Cal.3d at p. 405.) Which view was preeminent and controlling? "[T]he Legislature did not intend to authorize the juvenile court to substitute its judgment for that of CYA in such circumstances. The fact the question of release is debatable does not invoke judicial intervention—such circumstance tends instead to give conclusive effect to CYA's determination." (*Id.* at p. 406; see *People* v. *Ferrel* (1972) 25 Cal.App.3d 970, 976-977 [102 Cal.Rptr. 372].) Without a proper exhaustion of administrative remedies, the court cannot assess whether "CYA has failed to comply with the law or has abused its discretion in dealing with a ward in its custody." (*In re Owen E., supra,* 23 Cal.3d at p. 405.)

Essentially, *Breed* held that CYA could not refuse to accept a minor committed to it from a juvenile court. A juvenile court has no other option but CYA for a juvenile when all less-restrictive facilities have been exhausted. CYA's declaration of unamenability must be subservient to a juvenile court's commitment to CYA when it is a disposition of last resort —at least, that is, until the Legislature provides other options.

Three years later, however, *Owen E.* held otherwise. That is, the court held otherwise *because* it was not dealing with a juvenile for whom there were no

---

arrived at CYA. The material supports the final conclusion written in the order, but it is also supportive of the initial evaluation in favor of CYA treatment. It would have been most helpful had the board's decision been reviewed administratively first. We acknowledge California Code of Regulations, title 15, sections 4168-4178.5 state the standards for the board's decision and such include a determination that CYA treatment would be of "material benefit" to the person. Material benefit is found when "there is a reasonable possibility that his likelihood to commit criminal behavior can be significantly reduced or eliminated within the confinement time . . ." or when "there is a reasonable possibility that his criminal behavior would be exacerbated more by the other disposition alternatives available to the court when compared with the disposition alternatives available to the Y.A." These provisions appear to be directly addressed by the board's order in Lo's case. However, without an administrative review of the hearing, we are hesitant to conduct a judicial review of the hearing itself.

alternatives but CYA. (See also, *People* v. *Najera*, *supra*, 222 Cal.App.3d 1507, 1514 [Welf. & Inst. Code, § 1737.1 "provides a means for the [board] to *order* the recall of a ward it considers to be incorrigible or incapable of reform. . . . [¶] . . . [T]he court may recall a commitment and resentence a person based upon the Youth Authority's recommendation that he will no longer materially benefit from the commitment [under section 1737]. . . . We perceive no reason to conclude, as appellant has, that the procedure described in section 1737.1 supersedes that provided by section 1737."], original italics.)

*Owen E.* is controlling here. Lo is not a juvenile. He is, and always has been, treated as an adult. The superior court has alternatives to CYA in its determination of an appropriate sentence. The statute provides the court can "commit the person to a state prison or sentence him or her to a county jail as provided by law for punishment of the offense of which he or she was convicted." (Welf. & Inst. Code, § 1737.1.) The board has determined Lo is "an improper person to be retained by" CYA; until shown to be unlawful, we must accept that determination. (Cf. *In re Owen E.*, *supra*, 23 Cal.3d at pp. 405-406.) On this record, we cannot say whether the decision was lawful or not because Lo failed to exhaust his administrative remedies following the board's decision. Based on what was presented to the lower court—and what is before us now—the trial court failed to respond as required by statute to the board's order. The order is reversed and the action remanded for resentencing in accordance with the two alternatives (either "commit the person to a state prison or sentence him or her to a county jail as provided by law for punishment of the offense. . . .") enumerated in Welfare and Institutions Code section 1737.1, but without prejudice to Lo to pursue whatever administrative review, if any, is available to him.

Crosby, J., and Rylaarsdam, J., concurred.