101 Cal.Rptr.2d 456 (2000)
84 Cal.App.4th 1211
The PEOPLE, Plaintiff and Respondent,
v.
Arlene Dena SANDERS et al., Defendants and Appellants.
No. F033862.
Court of Appeal, Fifth District.
November 20, 2000.
Review Granted February 28, 2001.
*457 J. Peter Axelrod, under appointment by the Court of Appeal, for Defendant and Appellant Sanders.
Elizabeth M. Campbell, under appointment by the Court of Appeal, for Defendant and Appellant McDaniel.
Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Robert P. Whitlock and Leah Ann Alcazar, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION
WISEMAN, J.
In People v. Robles (2000) 23 Cal.4th 789, 97 Cal.Rptr.2d 914, 3 P.3d 311, the California Supreme Court held that the People may not validate a warrantless search of a residential garage, after the fact, based on advanced consent to probation searches when the searching officers were unaware of the advance consent. We hold, pursuant to the Robles rationale, that a warrantless search of a residence may not be justified as a parole search where the searching officer was unaware of the parole condition at the time of the search. We also conclude the "protective sweep doctrine" did not apply to the search here because it was a search of the entire residence without reasonable cause to believe the areas swept harbored an individual posing a danger to those on the arrest scene. We therefore reverse the judgment.

PROCEDURAL HISTORY
On May 17, 1999, an information was filed in Kern County Superior Court charging defendants, Arlene Sanders and Kenton McDaniel, with possession of cocaine base for purposes of sale (Health & Saf.Code, § 11351.5). It was further alleged that McDaniel was previously convicted of the same offense on or about May 9, 1997, within the meaning of Health and Safety Code section 11370.2, subdivision (a).
On May 26, 1999, Sanders filed a motion to suppress evidence pursuant to Penal Code section 1538.5, which was joined by McDaniel on June 1, 1999. McDaniel then filed a supplemental motion to suppress on June 2, 1999, which was denied on June 24, 1999.
On June 25, 1999, a motion was granted to amend the information to include count two, possession of a controlled substance *458 (Health & Saf.Code, § 11350, subd (a)), against Sanders. That same day, McDaniel entered a plea of guilty to count one in exchange for a sentence of no more than five years. The People's motion to strike his alleged prior conviction, conditioned upon the plea remaining in effect, was granted. Sanders pled guilty to count two in exchange for a sentence of no more than 16 months. The People's motion to dismiss count one as to Sanders, also conditioned on the plea remaining in effect, was granted.
On August 12, 1999, both defendants were sentenced. Sanders was denied probation, and sentenced to the low term of 16 months. McDaniel was denied probation, and sentenced to the upper term of 5 years. The court found him ineligible for the California Rehabilitation Center (CRC).
Sanders now appeals, contending the search of her apartment was unlawful and unreasonable under the Fourth Amendment to the United States Constitution, and all evidence should have been suppressed. McDaniel appeals on the ground the court erred in refusing to commit him to CRC. Following a request from this court for supplemental briefing on the search issue, McDaniel requested permission to join in Sanders' contention, and to also file a supplemental brief. We invited a response to these requests from the People. The People filed a response but made no opposition to McDaniel's requests. His requests to join in Sanders' contention and file a supplemental brief are granted.[1]

FACTS PRESENTED IN THE MOTION TO SUPPRESS HEARING
On April 6, 1999, Charlotte McKinley was the apartment manager of a complex located at 1905 California Avenue in Bakersfield. That day, the residents of apartment 17 informed McKinley that there was a disturbance in apartment 18. McKinley proceeded to call the police.
Bakersfield police officer Glen Davis responded with Officer Scott Thatcher. Upon arriving, Davis and Thatcher first met with McKinley, who directed them to apartment 18. When they got to the door, Davis and McKinley heard a male and female yelling at each other. Thatcher knocked on the door, and after a short time, someone inside looked out through the blinds, after which the arguing stopped. Davis and McKinley next heard the sound of the deadbolt lock, but the door was not opened. After waiting 15-30 seconds, Thatcher knocked again, announced the presence of the police, and ordered the door be opened immediately. Another 15-30 seconds passed, the officers heard the deadbolt lock mechanism again engage, and the door was opened.
Thatcher informed Davis that he observed a cut on Sanders' face, and saw McDaniel standing behind her. Davis described the cut as a "small abrasion[,] like a scrape," and testified the cut looked fresh. The two officers entered the apartment, at which point McDaniel was seen taking his hand out from between the couch cushions. Sanders then very quickly advised the police they were not welcome, stating, "What the fuck you all doing in my house? Get the fuck out of my house." Sanders subsequently began grappling with Thatcher. McDaniel walked toward Thatcher, advising him to leave Sanders alone, but Davis intervened, pressing McDaniel against the wall, and telling him to stay out of the situation. McDaniel attempted to push away from Davis a few times, so Davis handcuffed him. Shortly thereafter, Thatcher handcuffed Sanders.
After both defendants were handcuffed, Davis made a protective sweep of the *459 apartment to make sure there was no one else in the apartment that could endanger his or Thatcher's safety. Davis looked through the living room, kitchen, bathroom, and two bedrooms, limiting his search to areas where a person could be hiding. There was an open closet in one of the bedrooms. Inside the closet, in plain view, Davis observed a pair of brown work boots, one of which had a large amount of plastic bags stuffed inside with small white chunks of cocaine base knotted into the corners. Davis did not seize the items at this time, but rather continued his protective sweep.
Once the sweep was completed, Davis called police department communication to obtain McDaniel's parole status. After it was determined that McDaniel was on parole, and subject to search, Davis called for a K-9 unit, and another two-man unit to assist in a search of the apartment.
Davis testified that he observed mail addressed to both defendants inside the apartment, and both men and women's clothing. Additionally, McDaniel had a key in his pocket which worked the lock mechanism on the apartment door. A pair of stainless-steel-plated scissors, seven inches in length, was retrieved from between the couch cushions. A total of 4.72 grams of cocaine, as well as a gram scale, $390 cash, and a pager, were seized from the apartment.
Sanders testified the blemish on her face was the result of numerous fights she had been in previously, and the scar on her face was there long before April 6, 1999. Sanders denied receiving the blemish as a result of a fight with McDaniel. Sanders also testified she could not recall telling the police that she received the scratch on the day of the incident, or that it was a result of running away from McDaniel and falling against a stucco wall. Sanders did not receive medical treatment for her injury.

DISCUSSION
Defendants contend the court erred in denying their motion to suppress evidence pursuant to Penal Code section 1538.5 on the ground the warrantless search of their apartment was unreasonable under the Fourth Amendment to the United States Constitution. We agree.
A search without a warrant is presumed to be illegal. (People v. James (1977) 19 Cal.3d 99, 106, 137 Cal.Rptr. 447, 561 P.2d 1135.) Once the defendant shows the search was warrantless, the burden shifts to the People to justify the search by establishing the search fell within an exception to the warrant requirement. (Coolidge v. New Hampshire (1971) 403 U.S. 443, 454-455, 91 S.Ct. 2022, 29 L.Ed.2d 564; People v. Bishop (1996) 44 Cal.App.4th 220, 237, 51 Cal.Rptr.2d 629.)

Standard of review
"In reviewing the denial of a motion to suppress evidence, we view the record in the light most favorable to the trial court's ruling and defer to its findings of historical fact, whether express or implied, if they are supported by substantial evidence. We then decide for ourselves what legal principles are relevant, independently apply them to the historical facts, and determine as a matter of law whether there has been an unreasonable search and/or seizure. [Citation.]" (People v. Miranda (1993) 17 Cal.App.4th 917, 922, 21 Cal.Rptr.2d 785; accord People v. Ingram (1993) 16 Cal.App.4th 1745, 1750, 21 Cal.Rptr.2d 33.)

The court's ruling
In denying the motion to suppress, the court made various findings and rulings. Specifically, the court found exigent circumstances existed to permit the officers to enter the residence to investigate and perhaps arrest McDaniel for a domestic violence offense. The court also found the officers "had a duty to protect themselves *460 after they get in there." The court found McDaniel lacked standing to bring the motion because he had no expectation of privacy since he was on parole and subject to parole searches. As to Sanders, the court found that because she was living with someone who was subject to parole, she had reduced expectations of privacy.
Defendants do not challenge the initial entry by police into their apartment to investigate a potential domestic violence offense. They do challenge the search that followed after they were handcuffed in their apartment.

Protective sweep
Since there is no dispute that the officers lawfully entered the apartment, we first consider whether Officer Davis lawfully entered other areas of the apartment to determine if other people were present under the protective sweep doctrine.
The term "protective sweep" was defined by the U.S. Supreme Court as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." (Maryland v. Buie (1990) 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276.) The court rejected a probable cause standard to support a protective sweep of a residence. (Ibid.) It also rejected the State's position that no level of justification should be required for a sweep of the entire residence. (Id, at pp. 334-335, fn. 2, 110 S.Ct. 1093.) The court struck what it considered a proper balance, adopting a Terry[2] standard of reasonable suspicion "that the area swept harbors an individual posing a danger to those on the arrest scene." (Buie, supra, at p. 334, 110 S.Ct. 1093.) The Buie court's approval of such an action was based on:
"[the] interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack. The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter.... A protective sweep ... occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime. ... [A]n in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." (Maryland v. Buie, supra, 494 U.S. at p. 333, 110 S.Ct. 1093.)
Thus, law enforcement officers may "take reasonable steps to ensure their safety after, and while making, [an] arrest [in a home]." (Maryland v. Buie, supra, 494 U.S. at p. 334, 110 S.Ct. 1093.) These "reasonable steps" are of two types. First, the officers may, "without probable cause or reasonable suspicion" and as a "precautionary matter" "incident to the arrest," "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." (Ibid., emphasis added.) Second, if there exist "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene," the officers may further investigate the premises for purposes of insuring their safety. (Ibid.) In neither instance may the investigation be a "full search of the premises," and instead must be limited to "only [] a cursory inspection of those spaces where a person may be found." (Id. at p. 335, 110 S.Ct. 1093, fn. omitted.)
The record fails to support the officer's entry into and search of defendants' bedrooms under either part of the Buie doctrine. McDaniel was handcuffed in the living room as a suspect of spousal abuse or domestic violence. Sanders was also *461 handcuffed in the living room because of her abusive and adamant protests that the officers were not welcome in her house. At this point, Officer Davis made a protective sweep, explaining: "For our safety we make a protective sweep of the residence to make sure there is no one else in the residence that could endanger our safety." The apartment contained a living room, a kitchen, a bathroom and two bedrooms. Although the lay out of the apartment is not detailed in the record, a hallway separated the living room from the bedrooms and bathroom. The trial court did not expressly find the bedroom or its closet, in which the drugs were seen in plain view, were "spaces immediately adjoining the place of arrest," the living room. (Buie, supra, 494 U.S. at p. 334, 110 S.Ct. 1093; see, e.g., U.S. v. Lauter (2nd Cir.1995) 57 F.3d 212, 214-215.)[3] More importantly, the record does not support such a finding. In fact, the People have never argued before the trial court or on appeal that the bedroom or its closet was an immediately adjoining space for which no probable cause or reasonable suspicion was required under the first part of the Buie test. (Buie, supra, 494 U.S. at p. 334.) As stated in U.S. v. Sunkett (N.D.Ga.2000) 95 F.Supp.2d 1367,1372:
"Because the agents looked into every room in the apartment, including rooms not immediately adjacent to the front door, and every place within those rooms that a person could be hiding, their search must meet the standard for the second type of Buie search. To rule otherwise would render meaningless the phrase `spaces immediately adjoining the place of arrest' contained in Bute's description of the areas allowed to be searched solely on the basis of the in-home arrest."
We therefore consider the People's only claimthat the protective sweep was based on articulable facts warranting a reasonably prudent officer to believe the area swept harbored an individual posing a danger to those on the arrest scene.
From Officer Davis's testimony it is apparent that as a matter of course or based on departmental policy, "[f]or our safety we make a protective sweep of the residence to make sure there is no one else in the residence that could endanger our safety." This policy or course, however, is in direct contravention of the limits of the protective sweep doctrine adopted in Buie. As explained above, such a precautionary search is limited to immediately adjoining spaces, and does not extend to the entire residence. Officer Davis failed to articulate any basis or facts warranting a reasonable belief that another individual posing a danger to those on the arrest scene required a protective sweep of the entire residence. Nor do the People offer such a basis in the respondent's brief or supplemental brief. Instead, the People argue that nothing in the record "forestalled] the possibility that [Sanders'] injury may have been caused by another male hiding in the apartment ... [or] the possibility that another victim of the male attacker was located elsewhere in the apartment." While it is true that the possibilities for *462 fearing officer safety might be endless, Buie requires facts. (U.S. v. Sunkett, supra, 95 F.Supp.2d at p. 1372 ["the fact that someone else `might be' present is not a strong enough basis on which to justify the more pervasive type of Buie sweep conducted in this case"].)[4] No facts for believing any other individuals that posed a danger might be in the residence can be found in the record, and thus "the officers were not entitled to conduct a protective sweep under Buie." (U.S. v. Reid (9th Cir.2000) 226 F.3d 1020, 1027; U.S. v. Furrow (9th Cir.2000) 229 F.3d 805 [same].)
In rejecting a similar argument, the court in U.S. v. Chaves (11th Cir.1999) 169 F.3d 687, 692, stated:
"Much of the government's argument why a sweep was needed for protective purposes is not based on any specific facts in the government's possession, but rather is based on the lack of information in the government's possession. The testimony at the suppression hearing indicates that the officers had no information regarding the inside of the warehouse. However, in the absence of specific and articulable facts showing that another individual, who posed a danger to the officers or others, was inside the warehouse, the officers' lack of information cannot justify the warrantless sweep in this case. See United States v. Colbert, 76 F.3d 773, 778 (6th Cir.1996) (`Lack of information cannot provide an articulable basis upon which to justify a protective sweep.'); see also Sharrar v. Felsing 128 F.3d 810, 825 (3d Cir.1997) (`agree[ing] with ... Colbert that "[n]o information cannot be an articulable basis for a sweep that requires information to justify it in the first place"')."
None of the California cases applying Buie are particularly germane to the present case. Unlike some cases, McDaniel was not known to be armed or to have accomplices. (See People v. Maier (1991) 226 Cal.App.3d 1670, 1675, 277 Cal.Rptr. 667; People v. Dyke (1990) 224 Cal.App.3d 648, 661, 274 Cal.Rptr. 66.) The officers did not need to secure the premises for an extended period while they directed their attention to the execution of a search warrant. (See People v. Glaser (1995) 11 Cal.4th 354, 369, 45 Cal.Rptr.2d 425, 902 P.2d 729.) The offense for which McDaniel was arrested was not for a crime so serious that his friends or associates would be likely to attempt an ambush to free him. (See 3 La Fave, Search & Seizure: A Treatise on the Fourth Amendment (3d ed.1996) Entry and Search of Premises, § 6.4(c), p. 327.) The only other known occupant of the premises, of course, was Sanders, who also was handcuffed and not likely to interfere. Accordingly, there was nothing inherent in the nature of McDaniel's known background or the circumstances when the officers arrived at the scene that particularly would support a conclusion that some third person on the premises posed a threat to the officers or others. (See United States v. Kinney (6th Cir.1981) 638 F.2d 941, 944 ["The indicia of danger in this case, the movement at the window and the noise at the back door, are likely to occur in any occupied dwelling. These noises do not constitute a physical threat"], a pre-Buie case quoted in 3 La Fave, op. cit. supra, § 6.4(c), p. 334.)
It is clear that the showing made in this case fell far short of the requirement under Buie's second type of sweep. In U.S. v. Ford (D.C.Cir.1995) 56 F.3d 265, 269, the court rejected the government's argument where stronger facts were presented:
"The law enforcement officers who arrested Ford lacked a reasonable belief based on specific and articulable facts that the area searched harbored a dangerous *463 individual, which would justify Bute's second type of sweep. In its brief, the Government argues that the officers had the requisite articulable facts for Buie's second type of sweep: because the background check revealed that appellant had prior arrests and that the present arrest warrant was for homicide, the officers could assume that Ford might be armed and dangerous. However, when Godfrey began his sweep, appellant had already been arrested and placed in the custody of the police officers. As we recently stated in another protective sweep case, `the officers' awareness that [appellant] had a previous weapons conviction and could be dangerous did not itself directly justify the sweep. Once [appellant] was in custody, he no longer posed a threat to the police.' United States v. Henry, 48 F.3d 1282, 1284 (D.C.Cir.1995) (finding articulable suspicion based on informant's warning that appellant would have weapons, that appellant's `boys' or 'counterparts' might be with him, and that, when arrested just outside his front door, appellant said `they got me'); see also United States v. Tisdale, 921 F.2d 1095, 1097 (10th Cir.1990) (`[T]he danger which justifies a protective sweep comes from the possible presence of other armed and dangerous persons in the vicinity.'), cert. denied, 502 U.S. 986, 112 S.Ct. 596, 116 L.Ed.2d 619 (1991)."
Since reasonable suspicion did not support a protective sweep of spaces not immediately adjoining the area of the McDaniel's arrest, the search of the bedrooms cannot be justified as a protective sweep under Buie.

Parole search
Having determined the search of the bedrooms was not justified under the protective sweep exception to the warrant requirement, we consider whether the search was valid as a parole search.
Defendants concede there no longer is any requirement of reasonable suspicion for a parole search, provided the search is not arbitrary, capricious, or harassing. They further concede the authority to search the residence of a parolee extends to areas that are jointly controlled with other occupants of the residence. They contend, however, that in order for a parole search to be valid the officer must be aware of the search condition. We agree.
Defendants rely upon the California Supreme Court case of In re Martinez (1970) 1 Cal.3d 641, 83 Cal.Rptr. 382, 463 P.2d 734. In Martinez, the defendant was released on parole in June 1962. In February 1963, the defendant was subsequently arrested and charged with possession of heroin, and was eventually found guilty in October 1963, resulting in revocation of his parole in February 1964. In March 1965, the appellate court reversed the defendant's conviction, in part, on the grounds the evidence introduced at trial was the result of an unconstitutional search.[5] (Id. at p. 644, 83 Cal.Rptr. 382, 463 P.2d 734.)
Despite the reversal, however, the defendant remained in jail on the basis of his parole having been revoked. Although the adult authority was aware of the conviction reversal, it decided against restoring the defendant's parole status when the defendant's application for parole came up for consideration in October 1965. In reaching its decision, the authority considered the evidence previously determined to have been illegally obtained. (1 Cal.3d at pp. 645-646, 83 Cal.Rptr. 382, 463 P.2d 734.)
The California Supreme Court granted review, and considered whether the adult authority could properly consider evidence which had been obtained as a result of an unconstitutional search and seizure. In *464 deciding this evidence could not be considered, the Supreme Court stated:
"Although past cases have sometimes declared that a parolee is in `constructive custody' or Svithout liberty,' `[f]ictions of "custody" and the like ... cannot change the reality of a parolee's conditional freedom and cannot affect the constitutional protections surrounding his interest in that conditional freedom.' [Citation.] In the instant case regular police officers undertook the search pursuant to their general law enforcement duties; the officers, at the time of the search, did not even know of defendant's parole status. The investigation involved suspected criminal activity, not parole violations. Under these circumstances the officers cannot undertake a search without probable cause and then later seek to justify their actions by relying on the defendant's parole status, a status of which they were unaware at the time of their search. [Citations.]" (In re Martinez, supra, 1 Cal.3d at pp. 646-647, 83 Cal.Rptr. 382, 463 P.2d 734; fn. omitted.)
The basis for the above statement in Martinez, however, appeared to have been undermined by subsequent California Supreme Court decisions in In re Tyrell J. (1994) 8 Cal.4th 68, 32 Cal.Rptr.2d 33, 876 P.2d 519, and People v. Reyes (1998) 19 Cal.4th 743, 80 Cal.Rptr.2d 734, 968 P.2d 445. (See People v. Lewis (1999) 74 Cal. App.4th 662, 668, 88 Cal.Rptr.2d 231 ["The Martinez holding cited above can no longer be regarded as controlling"].)
In Tyrell J., the minor was declared a ward of the court for his commission of a battery, and placed on probation "subject to a variety of conditions, including that he '[s]ubmit to a search of [his] person and property, with or without a warrant, by any law enforcement officer, probation officer or school official'" (In re Tyrell J., supra, 8 Cal.4th at p. 74, 32 Cal.Rptr.2d 33, 876 P.2d 519.) In October 1991, the minor and two friends were attending a football game. Although the temperature exceeded 80 degrees, a Fresno police officer noticed one of the minor's friends wearing a heavy coat. The officer, along with a detective, approached the three boys, and after pulling away the coat, observed a large knife. The three boys were then asked to walk over to a fence. As the minor walked to the fence, he was seen adjusting his pants three times. Once the minor reached the fence, the officer conducted a pat search, and discovered a bag of marijuana. (Id. at pp. 74-75, 32 Cal. Rptr.2d 33, 876 P.2d 519.)
Although the officer testified he was unaware of the search condition at the time of the search, the juvenile court denied the minor's suppression motion. This court, however, reversed, finding the officer did not have probable cause to search the minor, and the existent search condition did not validate the search. (Id. at p. 75, 32 Cal.Rptr.2d 33, 876 P.2d 519.) The Supreme Court granted the People's petition for review and reversed, stating:
"[A] juvenile probationer subject to a valid search condition does not have a reasonable expectation of privacy over his or her person or property. In this case, Tyrell J. was subject to a valid search condition, directly imposed on him by the juvenile court in a prior matter. We presume he was aware of that limitation on his freedom, and that any police officer, probation officer, or school official could at any time stop him on the street, at school, or even enter his home, and ask that he submit to a warrantless search. There is no indication the minor was led to believe that only police officers who were aware of the condition would validly execute it. The minor certainly could not reasonably have believed Officer Villemin would not search him, for he did not know whether Villemin was aware of the search condition. Thus, any expectation the minor may have had concerning the privacy of his bag of marijuana was manifestly unreasonable." (In re Tyrell J., supr
a, 8 *465 Cal.4th at p. 86, 32 Cal.Rptr.2d 33, 876 P.2d 519, fn. omitted.)
Significantly, the Supreme Court also directly addressed, and rejected as distinguishable, the holding in Martinez, on which defendants here rely:
"Although this passage appears conducive to the minor's position, we are not persuaded by the stated rationale in Martinez because, at the time that decision was rendered, there existed no automatic search condition imposed on parolees, inclusive of searches to be performed either by parole officers or law enforcement officers. Therefore, although the defendant in Martinez might have been subject to search by his parole officer, he could reasonably expect to be free of arbitrary searches by police officers. [Citation.] As the Court of Appeal opinions in [In re] Marcellus L., [(1991)] supra, 229 Cal. App.3d 134, 279 Cal.Rptr. 901, and [In re] Binh L., [(1992)] supra, 5 Cal. App.4th 194, 6 Cal.Rptr.2d 678, explain, and as we make clear in our opinion today, one must first have a reasonable expectation of privacy before there can be a Fourth Amendment violation." (In re Tyrell J., supra, 8 Cal.4th at pp. 88-89, 32 Cal.Rptr.2d 33, 876 P.2d 519.)
Subsequently, in Reyes, the Supreme Court "granted review to resolve the tension apparent in our precedents and to decide whether the logic of Tyrell J. has significance in the context of adult parole searches." (People v. Reyes, supra, 19 Cal.4th at p. 746, 80 Cal.Rptr.2d 734, 968 P.2d 445.) In extending the rationale of Tyrell J. to adult parole searches, the Supreme Court stated:
"We think the Attorney General offers the better argument. The `logic of Tyrell J. applies equally, if not more so, to parolees.' Because of society's interest both in assuring the parolee corrects his behavior and in protecting its citizens against dangerous criminals, a search pursuant to a parole condition, without reasonable suspicion, does not `intrude on a reasonable expectation of privacy, that is, an expectation that society is willing to recognize as legitimate.' [Citation.] We agree, [¶] ... [¶] The rationale of Tyrell J. can be stated succinctly. When involuntary search conditions are properly imposed, reasonable suspicion is no longer a prerequisite to conducting a search of the subject's person or property. Such a search is reasonable within the meaning of the Fourth Amendment as long as it is not arbitrary, capricious or harassing. Tyrell J.'s reasoning applies with equal force to adults. In both cases the expectation of privacy is already reduced by the absence of the warrant requirement. As a convicted felon still subject to the Department of Corrections, a parolee has conditional freedomgranted for the specific purpose of monitoring his transition from inmate to free citizen. The state has a duty not only to assess the efficacy of its rehabilitative efforts but to protect the public, and the importance of the latter interest justifies the imposition of a warrantless search condition." (People v. Reyes, supra, 19 Cal.4th at pp. 751-752, 80 Cal.Rptr.2d 734, 968 P.2d 445.)
Based on the holdings in Reyes and Tyrell J., we cannot fault the trial court for having concluded that prior knowledge of McDaniel's parole status and its associated search condition was not required to validate the search of the apartment. (See People v. Lewis, supra, 74 Cal.App.4th at p. 668, 88 Cal.Rptr.2d 231.) However, in Reyes, the searching officers were aware of Reyes' parole status and search condition, and Tyrell J. concerned a search of Tyrell's person, not his residence. In Martinez, the search was of a residence for police investigation of suspected criminal activity, not parole violations. Further, at the time of the search the officers were unaware of Martinez's parole status. Similar factors recently caused the California Supreme Court in People v. Robles, supra, 23 Cal.4th at page 789, 97 Cal. *466 Rptr.2d 914, 3 P.3d 311, to invalidate a search of a residential garage.
In Robles, the police searched the defendant's residential garage without a warrant. Later, the police discovered that defendant's brother, a cohabitant of the residence, was on probation and subject to a probation search. When defendant made a motion to suppress the evidence, the People sought to validate the search as a probation search after the fact, relying on Tyrell J. and People v. Woods (1999) 21 Cal.4th 668, 88 Cal.Rptr.2d 88, 981 P.2d 1019 [common authority theory of consent applies to cohabitant regarding shared areas of a residence based on the probationer's advance consent]. The court declined to extend Tyrell J. and Woods to validate the search.
The court began by stating the general rules relating to searches of residences.
"`[P]rivate residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is plainly one that society is prepared to recognize as justifiable.' [Citations.] Likewise, a garage that is attached or adjacent to a home may give rise to a legitimate expectation of privacy therein. [Citations.] Under the Fourth Amendment, a warrantless search of such an area is unreasonable per se unless it falls within a recognized exception to the warrant requirement, for example, where consent to the search has been given. [Citations.]" (Robles, supra, 23 Cal.4th at p. 795, 97 Cal.Rptr.2d 914, 3 P.3d 311.)
The court then distinguished the Woods follows:
"In People v. Woods, supra, 21 Cal.4th 668 [88 Cal.Rptr.2d 88, 981 P.2d 1019], two persons who resided with a probationer challenged the constitutionality of a warrantless search of their home by a police officer who relied on the authority of a known search clause to seek incriminating evidence against another party residing in the home. (21 Cal.4th at pp. 672-673 [88 Cal.Rptr.2d 88, 981 P.2d 1019].) In evaluating the legality of the search, we found it appropriate to apply an objective standard. In the context of probation searches, we explained, the question is whether the circumstances, viewed objectively, show a proper probationary justification for an officer's search; if they do, then the officer's subjective motivations with respect to a third party resident do not render the search invalid. [Citations.] We concluded there that, regardless of the searching officer's ulterior motives, the circumstances presented ample justification for a search pursuant to the probation clause at issue because the facts known to the officer showed a possible probation violation. [Citation.]
"Contrary to the People's argument, People v. Woods, supra, 21 Cal.4th 668 [88 Cal.Rptr.2d 88, 981 P.2d 1019], does not support the proposition that police officers may lawfully enter a residential premises, without a warrant and without any awareness of a resident's probation search condition, to indiscriminately search for and seize evidence of suspected criminal wrongdoing." ((Robles, supra, 23 Cal.4th at pp. 796-797, 97 Cal. Rptr.2d 914, 3 P.3d 311, fn. omitted.)
Next, the court refused to extend the logic of the Tyrell J. case on two grounds. The first ground pertained to the reasonable expectation of privacy of a cohabitant.
"The logic of Tyrell J. cannot be stretched to vitiate the illegality of the police action here. Even though a person subject to a search condition has a severely diminished expectation of privacy over his or her person and property, there is no doubt that those who reside with such a person enjoy measurably greater privacy expectations in the eyes of society. For example, those who live with a probationer maintain normal expectations of privacy over their persons. In addition, they retain valid privacy expectations in residential areas subject *467 to their exclusive access or control, so long as there is no basis for officers to reasonably believe the probationer has authority over those areas. [Citations.] That persons under the same roof may legitimately harbor differing expectations of privacy is consistent with the principle that one's ability to claim the protection of the Fourth Amendment depends upon the reasonableness of his or her individual expectations. [Citations.]
"It is true that if persons live with a probationer, common or shared areas of their residence may be searched by officers aware of an applicable search condition. [Citations.] Critically, however, cohabitants need not anticipate that officers with no knowledge of the probationer's existence or search condition may freely invade their residence in the absence of a warrant or exigent circumstances. Thus, while cohabitants have no cause to complain of searches that are reasonably and objectively related to the purposes of probationfor example, when routine monitoring occurs [citation] or when facts known to the police indicate a possible probation violation that would justify action pursuant to a known search clause [citation]they may legitimately challenge those searches that are not. Tyrell J., which focused specifically on the reasonableness of a probationer's privacy expectations, does not indicate otherwise." (Robles, supra, 23 Cal.4th at pp. 798-799, 97 Cal.Rptr.2d 914, 3 P.3d 311, fn. omitted.)
Under this analysis, McDaniel's parole status cannot be used to validate the search with regard to Sanders. Sanders had a reasonable expectation of privacy in her residence. Further, the search was not conducted pursuant to a known search clause, and was not motivated by rehabilitative, reformative or legitimate law enforcement or parole purposes. Therefore, the search cannot stand as a valid parole search with respect to her. The People appropriately concede this in their supplemental brief.
The question of whether the same result follows for McDaniel is not so clear, since the above rationale does not apply to him. There are two considerations, however, that lead us to the conclusion that the search may not be validated as a parole search after the fact with respect to McDaniel either. The first has to do with the fact the search involved his residence instead of his person, which was the case in Tyrell J. In Robles, the court considered this circumstance significant.
"Finally, we observe the principal purpose of the exclusionary rule `"is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures."' [Citations.] In Tyrell J., we concluded that dispensing with a strict `knowledge-first' rule would not encourage law enforcement officials to engage in warrantless searches of juveniles because they would be `[taking] the chance' that if the target of a search is not subject to a search condition, any contraband found will be inadmissible in court. [Citation.] Although police officers therefore have sufficient incentive to avoid an improper search of a person (ibid.), residential searches present an altogether different situation.
"Notably, residences frequently are occupied by several people living together, including immediate family members and perhaps other relatives or friends, as well as guests. Allowing the People to validate a warrantless residential search, after the fact, by means of showing a sufficient connection between the residence and any one of a number of occupants who happens to be subject to a search clause, would encourage the police to engage in facially invalid searches with increased odds that a justification could be found later. It also would create a significant potential for abuse since the police, in effect, would be conducting searches with no perceived boundaries, limitations, or justification. *468 [Citation.] The potential for abuse, with its consequent impact on the citizenry, is especially heightened in high crime areas where police might suspect probationers to live. Thus, while society generally has an interest in having all probative evidence before the court, in circumstances such as these a knowledge-first requirement is appropriate to deter future police misconduct and to effectuate the Fourth Amendment's guarantee against unreasonable searches and seizures. [Citation.]" (Robles supra, 23 Cal.4th at pp. 799-800, 97 Cal.Rptr.2d 914, 3 P.3d 311.)
In light of the potential for abuse, with the harmful impact such abuse would have on our citizenry, the societal interest in having all probative evidence before the court is outweighed by the societal interest in the privacy and sanctity of our homes. The Robles rationale applies equally here because it would discourage warrantless, suspicionless searches of homes if officers know that any incriminating evidence cannot simply be pinned on a resident later discovered to be subject to parole or probation searches. In this case, for example, Sanders can vindicate her Fourth Amendment rights by suppression of the drugs found in her apartment in her criminal case. Yet, while the police conduct is no different with respect to McDaniel, allowing the evidence to be used in a criminal case against him solely because of his parole status encourages the conduct here. The end result is that while non-parolee residents may vindicate their Fourth Amendment rights, they will still be forced to endure warrantless, suspicionless searches of their homes because the police can hope that someone in the home will be on probation or parole. Such a result defeats the principal purpose of the exclusionary rule to deter future unlawful police conduct. As a result, contrary to the trial court's ruling, McDaniel had standing to urge suppression of the evidence because he had a subjective expectation of privacy in his home, and the government's intrusion infringed upon the personal and societal values protected by the Fourth Amendment. (Robles, supra, 23 Cal.4th at p. 800, 97 Cal.Rptr.2d 914, 3 P.3d 311; Tyrell J., 8 Cal.4th at pp. 83-84, 32 Cal.Rptr.2d 33, 876 P.2d 519.)
Further, on the issue of standing, while Reyes significantly narrowed legitimate privacy rights of parolees, it did not completely eliminate them. (Reyes, supra, 19 Cal.4th at pp. 753-754, 80 Cal.Rptr.2d 734, 968 P.2d 445.) Thus, the issue is not McDaniel's standing to object to the police conduct, but whether the police conduct was reasonable when applied to the appropriate standard applicable to his legitimate expectation of privacy. After Reyes, the standard for warrantless searches of parolees is no longer the reasonable suspicion standard. Reyes struck a new balance between individual interest and government necessity. The standard adopted in Reyes is that parole searches (1) not be at an unreasonable hour; (2) not be unreasonably prolonged; or (3) not be for other reasons establishing arbitrary or oppressive conduct by the searching officer. (Id. at pp. 753-754, 80 Cal.Rptr.2d 734, 968 P.2d 445.) In explaining the third reasonableness category, the court noted that "a search is arbitrary and capricious when the motivation for the search is unrelated to rehabilitative, reformative or legitimate law enforcement purposes or when the search is motivated by personal animosity toward the parolee ... by law enforcement officers [or] at their whim or caprice...." (Id. at p. 754, 80 Cal.Rptr.2d 734, 968 P.2d 445.)
Robles suggests that the search of a particular residence cannot be reasonably related to a proper parole purpose when the officers involved do not even know of a parolee who is sufficiently connected to the residence.
"As our decisions indicate, searches that are undertaken pursuant to a probationer's advance consent must be reasonably related to the purposes of probation. [Citations.] Significantly, a search of a *469 particular residence cannot be `reasonably related' to a probationary purpose when the officers involved do not even know of a probationer who is sufficiently connected to the residence. Moreover, if officers lack knowledge of a probationer's advance consent when they search the residence, their actions are wholly arbitrary in the sense that they search without legal justification and without any perceived limits to their authority." (Robles, 23 Cal.4th at p. 797, 97 Cal. Rptr.2d 914, 3 P.3d 311.)
The second consideration is that while Tyrell J. refused to extend the rationale of the Martinez case to the circumstances where the intrusion involved a search of a minor's person on probation, the Martinez case has not been expressly overruled on its own facts. To be sure, our California Supreme Court has provided mixed signals to its lower courts in the way it has resolved Tyrell J., Reyes, Woods and Robles. We agree with the court in People v. Lewis, supra, 74 Cal. App.4th at page 668, 88 Cal.Rptr.2d 231, that Martinez's legal premise has been undermined. We disagree, however, that the holding in Martinez can no longer be regarded as controlling. Robles has limited "[T]he logic of Tyrell J." (Robles, supra, 23 Cal.4th at p. 798, 97 Cal.Rptr.2d 914, 3 P.3d 311), which had limited the rationale of Martinez. (Tyrell J., supra, 8 Cal.4th at pp. 88-89, 35 Cal.Rptr.2d 613, 884 P.2d 70.) At this juncture, Martinez and Robles require "knowledge first" to validate a residential search based on a search condition. Under the doctrine of stare decisis, we are bound to apply Martinez because it has never been expressly overruled and this case is factually indistinguishable from Martinez. (See Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450; 455, 20 Cal.Rptr. 321, 369 P.2d 937.) We note that the Martinez rationale survived for 24 years until questioned in Tyrell J., and it continues to have some vitality after Robles. The six-year-old "logic of Tyrell J." has been subject to much criticism and may have no application to residential searches. (See Robles, 23 Cal.4th at p. 806, 97 Cal.Rptr.2d 914, 3 P.3d 311, dis. opn. of Brown, J.) Rather than attempt to blaze a new trail by departing from the Martinez rationale on indistinguishable facts, we await further guidance from the California Supreme Court on this important issue.
Therefore, we find the court erred by relying on McDaniel's parole status for denying defendants' motions to suppress.

DISPOSITION
The judgment as to both Sanders and McDaniel is reversed, and the superior court is directed to grant defendants' motions to suppress the evidence seized from their residence.
THAXTER, Acting P.J., and HARRIS, J., concur.
NOTES
[1] In light of our conclusion that the judgment must be reversed, the People's contention that McDaniel's CRC contention is not appealable is moot. As to the People's similar contention with respect to Sanders' appeal, we had previously granted her request to amend her notice of appeal so that it is now properly before us.
[2] Terry v. Ohio (1968) 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.
[3] The apartment in Lauter had no windows, no kitchen, no bathroom, and consisted of two small rooms: the first room and an adjacent room containing a bed. (U.S. v. Lauter, supra, 57 F.3d at p. 213.) The district court had "concluded that the back room was `immediately adjoining' the area in which Lauter was arrested, and thus deemed the sweep permissible even in the absence of any particularized suspicion." (Id. at pp. 216-217.)

In U.S. v. Robinson (N.D.Ill.1991) 775 F.Supp. 231, the court considered whether the precautionary sweep of immediately adjoining areas applied in its case. There, the building at which suspect Oliver was arrested had an outer door that opened into a vestibule. A few steps away was a pool room, which immediately adjoined the defendant's bedroom. The court noted, "[t]he four officers' testimony that they controlled and arrested Oliver at the interior doorway [of the pool room] makes Buie applicable; Oliver's testimony, on the other hand, that the officers controlled him with a gun to his head just inside the exterior doorway, several feet from Robinson's bedroom, renders Buie inapplicable, absent articulable facts under the second pari of the Buie test." (Id. at p. 233.)
[4] See also United States v. Delgadillo-Velasquez (9th Cir.1988) 856 F.2d 1292, 1298 (protective sweep held unconstitutional where officers had "no information that any other persons were in the apartment"); U.S. v. Akrawi (6th Cir.1990) 920 F.2d 418, 420-421 (same).
[5] The defendant was arrested outside his home, his home was searched without a search warrant, and narcotics were found.